## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| RX MEDICAL, LLC, | ) | |
| ROK SALES, LLC and | ) | |
| ROK MEDICAL MANAGEMENT, LLC | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Case No. CJ 2022-4032 |
| | ) | |
| ROBEN MELTON, JUSTIN POOS, | ) | FILED IN DISTRICT COURT |
| BRADY CLINE, TODD PERRY, | ) | OKLAHOMA COUNTY |
| SHELBY BULLARD, GREG MASON, | ) | |
| JOSHUA MCDONALD, KRISTY MOORE, | ) | AUG 1 9 2022 |
| DIGSS INVESTMENTS, LLC, | ) | |
| STRYKER CORPORATION, | ) | RICK WARREN |
| SUMMIT SPINE SOLUTIONS, LLC, | ) | COURT CLERK |
| and RD MEDICAL, LLC, | ) | 126 _____ |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION WITH BRIEF IN SUPPORT

Pursuant to 12 Okla. Stat. § 1381 *et seq.*, Plaintiffs, RX Medical, LLC, ROK Sales, LLC, and ROK Management, LLC ("Plaintiffs"), move the Court for a Temporary Restraining Order ("TRO") to be entered against Defendants Roben Melton, Justin Poos, Brady Cline, Todd Perry, Shelby Bullard, Greg Mason, Joshua McDonald, and Kristy Moore (hereinafter collectively referred to as "Individual Defendants"), Defendant DIGSS Investments, LLC ("DIGSS"), Defendant Stryker Corporation ("Stryker"), Defendant Summit Spine Solutions, LLC ("Summit Spine"), and Defendant RD Medical, LLC ("RD Medical") (hereinafter, DIGSS, Stryker, Summit and RD Medical are collectively referred to as the "Corporate Defendants") (the Individual Defendants and the Corporate Defendants are collectively referred to herein as "Defendants") for such period of time until the Court may afford the parties a hearing on the issue of a temporary

Exhibit 3
Page 1 of 53

injunction. Plaintiffs specifically request that the Court grant a TRO, and subsequent Temporary Injunction, to preserve the *status quo* by ordering:

      1.     The Individual Defendants to immediately cease and desist from directly soliciting any person or company who was an established customer of Plaintiffs.

      2.     The Individual Defendants to immediately cease and desist from assisting the Corporate Defendants, or any of their respective employees or agents, in directly soliciting any person or company who was an established customer of Plaintiffs through the use of confidential data or trade secrets learned by the Individual Defendants during the course of the Individual Defendants' employment with Plaintiffs, or secured by Defendants through their collective unauthorized access to Plaintiffs' computer systems and/or servers.

      3.     The Corporate Defendants to immediately cease and desist from assisting the Individual Defendants with, or participating in, the Individual Defendants' direct solicitation of any person or company who was an established customer of Plaintiffs through the use of confidential data or trade secrets learned by the Individual Defendants during the course of the Individual Defendants' employment with Plaintiffs, or secured by Defendants through their collective unauthorized access to Plaintiffs' computer systems and/or servers.

      4.     The Individual Defendants and the Corporate Defendants to immediately cease and desist from using, and to return to Plaintiffs, any and all confidential materials, and other such material as may be considered by Plaintiffs to be trade secrets, which were generated by or for Plaintiffs, and/or which were learned or obtained by the Individual Defendants, during the course of the Individual Defendants' employment with Plaintiffs, or secured by Defendants through their collective unauthorized access to Plaintiffs' computer systems and/or servers, including without

Exhibit 3
Page 2 of 53

limitation any strategic pricing information, customer lists, customer preference data, customer usage data, and market data.

5.     The Defendants to immediately return to Plaintiffs all of Plaintiffs' medical equipment, instruments, and supplies which were taken by the Defendants, and/or not returned to Plaintiffs, upon the resignation of the Individual Defendants.

6.     The Defendants to immediately identify and provide to Plaintiffs all calendar and scheduling information regarding upcoming procedures and/or orders, which the Individual Defendants improperly deleted and/or destroyed upon their resignation, and all information copied, shared and/or disclosed by the Individual Defendants to Stryker or the other Corporate Defendants, including through their unauthorized access to Plaintiffs' computer systems/servers.

In support of their Motion, Plaintiffs state as follows:

## STATEMENT OF FACTS

For their Statement of Facts, Plaintiffs specifically adopt and incorporate by reference the factual background set forth in their Petition, filed this same date, and which is attached as Exhibit "1" hereto. In addition, Plaintiffs highlight for the Court the following key facts from the Petition which are pertinent to this Motion:

1.     Plaintiffs, RX Medical, LLC, ROK Sales, LLC, and ROK Medical Management, LLC, have common ownership and are all part of the RX Medical Family of Companies. Plaintiffs provide marketing, sales, and distribution services to medical device manufacturers. Plaintiffs have contractual agreements with medical product manufacturers to market, sell, and distribute the manufacturers' medical products to physicians, hospitals, and other healthcare facilities to be used in the medical and surgical treatment of patients.

Exhibit 3
Page 3 of 53

2.      For more than twenty (20) years, Plaintiffs have worked to establish, and have established, relationships with physicians, medical groups, hospitals, and other healthcare providers within Oklahoma who purchase and use their medical products.

3.      A large part of Plaintiffs' business is the marketing, sale, and distribution of spine products, *i.e.*, products used in the treatment of patients undergoing spine surgery.

4.      Plaintiffs have a complete line of spine products.  That is to say that Plaintiffs carry every product that their spine surgeon or hospital customers needed to complete a spine surgery. Plaintiffs do this by contracting with several different product manufacturers to ensure there are no gaps in their line of spine products.

5.      During all times relevant herein, RX Medical had a contractual agreement with ZimVie, Inc. to market, sell, and distribute its spine products to spine surgeons practicing in Oklahoma.  The ZimVie contract was Plaintiffs primary line of spine products.

6.      ZimVie, however, does not offer all products that Plaintiffs' spine surgeon and hospital customers may need in their spine surgeries.  To fill the gaps in the ZimVie product line, Plaintiffs contracted with other third-party medical device manufacturers, including, but not limited to, Centinel Spine, Spineology, and Zavation.  As a result, Plaintiffs have a complete and comprehensive line of spine products to offer its customers – the physicians and hospitals that purchase its products.

7.      Plaintiffs had a team of individuals employed to market, sell, distribute, and service its spine products ("Spine Team").  The Individual Defendants, Melton, Poos, Cline, Perry, Bullard, Mason, McDonald and Moore, were the core of Plaintiffs Spine Team and were employed by Plaintiffs to market, sell and distribute its spine products.

4

Exhibit 3
Page 4 of 53

8.      Plaintiffs' Spine Team was managed by Defendant Poos.  Defendant Poos had two sales teams under him, one managed by Defendant Melton and the other by Defendant Cline. Defendants Melton and Cline each managed the other six (6) sales representatives, including Defendants Perry, Bullard, Mason, and McDonald.  Moore was the operations manager over revenue management and inventory management.  All Individual Defendants participated in business management and strategic business planning for Plaintiffs.

9.      Through years of employment with Plaintiffs, the Individual Defendants were provided and gained knowledge of Plaintiffs' confidential trade secret information.  Such information includes, but is not limited to, strategic pricing information, customer lists, customer preference data, customer usage data, and market data, and distributorship/agency agreements.

10.     In consideration of and as a condition of RX Medical's employment of Defendants Melton, Poos, and Cline, each individually entered an Employee Non-Compete Agreement with RX Medical that prohibited Melton, Poos, and Cline, from soliciting RX Medical's existing customers for one (1) year following the termination of their employment.  Specifically, the Employee Non-Compete states:

> For Good consideration, and in consideration of my being employed, whether on a sub contract basis or as a full time employee, in whole or in part by RxMedical, I the undersigned agree that upon my termination of employment and notwithstanding the cause of termination, I shall not compete with the business of the Firm or its successors or assigns.
>
> The term "not compete" as used in this agreement shall mean that I shall not directly or indirectly, or in any capacity, on my own behalf or on behalf of any other firm undertake or assist in the solicitation of any client or account of the Firm existing during the course of my employment with Rx Medical.
>
> This non-compete agreement shall remain in full force and in effect for one year commencing with the date of employment termination.

Exhibit 3
Page 5 of 53

*See* Exhibit A to Petition, The Employee Non-Compete Agreements for Defendants Melton, Poos, and Cline (emphasis added).

11.     In consideration and as a condition of Defendant Perry's employment with RX Medical, Defendant Perry entered into a Confidentiality and Non-Competition Agreement with RX Medical.   Pursuant to the agreement, Perry agreed: (a) not to solicit any customer of RX Medical or Zimmer (now ZimVie) for a period of one (1) year following the termination of his employment with RX Medical; (b) not to solicit other RX Medical sales associates to terminate their relationship with RX Medical or ZimVie to become employed or associated with a competitor of RX Medical or ZimVie for a period of one (1) year following his termination; (c) not to compete with RX Medical or ZimVie in a defined geographical area for a period of one year; and (d) not to disclose certain confidential information of RX Medical and/or ZimVie for a period of five (5) years following termination of employment.   *See* Exhibit B to Petition, Confidentiality and Non-Competition Agreement between RX Medical and Defendant Perry.

12.     Defendant Stryker is a competitor of Plaintiffs and ZimVie.   Stryker manufacturers similar spine products to those manufactured by ZimVie.   Stryker also has a sales force that markets, sells, and distributes its spine products to physicians and hospitals in the treatment of patients undergoing spine surgery, making them a direct competitor of Plaintiffs in the Oklahoma market.

13.     Defendant RD Medical is an independent medical distributor that is contracted to distribute Defendant Stryker's spine products in the Oklahoma market. Upon information and belief, Defendant RD Medical also contracts with other third party device manufacturers for spine products to fill gaps in Stryker's spine product line.

Exhibit 3
Page 6 of 53

14.     Defendant Summit Spine is a medical distributor that is contracted to distribute certain third-party Spine Products in the Oklahoma market.

15.     Upon information and belief, RD Medical and Summit Spine use the same sales representatives and work together to offer a complete line of spine products in the Oklahoma market and compete directly with Plaintiffs.

16.     At approximately 12:00 p.m. on Friday, August 12, 2022, Plaintiffs were notified by the Individual Defendants that they, and Plaintiffs entire Spine Team (save two newly hired individuals), were terminating their employment relationship with Plaintiffs effective that day at 5:00 p.m. central time.

17.     The Individual Defendants left Plaintiffs' employment to become employees of Stryker and to distribute Stryker's spine products in the Oklahoma market.   The Individual Defendants are also working for or with Defendant Summit Spine to contract with third parties to distribute supplemental spine products – the same third-party manufacturers that have contracts with Plaintiffs.

18.     For several months prior to the termination of the Individual Defendants' employment with Plaintiffs, the Defendants worked in concert to develop and execute a scheme intended to overtake and destroy Plaintiffs' spine business.

19.     For several months prior to the termination of their employment with Plaintiffs, the Individual Defendants colluded and conspired with Stryker and RD Medical to steal Plaintiffs' customers (physicians and hospitals) and convert those customers from the ZimVie's spine product line to Stryker's spine product line.

Exhibit 3
Page 7 of 53

20.     The Individual Defendants actively solicited Plaintiffs' customers to switch from the ZimVie spine products to Stryker's spine products both before and after their employment with Plaintiffs ended.

21.     For several months prior to the termination of their employment with Plaintiffs, the Individual Defendants colluded and conspired with Summit Spine to take many, if not all, of the third-party contracts for the supplemental spine products held by Plaintiffs.

22.     For several months prior to the termination of their employment with Plaintiffs, the Individual Defendants colluded and conspired with Stryker and RD Medical to steal Plaintiffs' customers (physicians and hospitals) and convert those customers from the ZimVie's spine product line to Stryker's spine product line.

23.     The Individual Defendants actively solicited Plaintiffs' customers to switch from the ZimVie spine products to Stryker's spine products both before and after their employment with Plaintiffs ended.

24.     For several months prior to the termination of their employment with Plaintiffs, the Individual Defendants colluded and conspired with Summit Spine, DIGSS, and/or other affiliate entities to take many, if not all, of the third-party contracts or replace it with other competing third-party contracts for the supplemental spine products held by Plaintiffs.

25.     The Individual Defendants were working in concert with Summit Spine, and/or DIGSS, and/or other affiliate entities to actively solicit manufacturers that Plaintiffs had third-party contracts with to switch those contracts to Summit Spine, DIGSS, other affiliate entities and/or themselves individually.  This solicitation occurred both before and after their employment with Plaintiffs ended.

8

Exhibit 3
Page 8 of 53

26.     Part of the Individual Defendants job with Plaintiffs was to work with Plaintiffs' hospital customers to negotiate and set pricing for Plaintiffs' spine products. The Individual Defendants accessed and used Plaintiffs' pricing to begin competing with Plaintiffs while still employed.  Specifically, while still employed with Plaintiffs, Defendants surreptitiously submitted pricing bids to Plaintiffs' hospital customers on spine products that the Individual Defendants would be distributing after leaving their employment with Plaintiffs.  These are spine products that compete directly with those offered by Plaintiffs. The Individual Defendants used Plaintiffs' pricing to match the pricing on the bids for the competing products.

27.     While employed by Plaintiffs, Defendant Poos, Defendant Melton, Defendant Cline, and Defendant Moore colluded to contract with third-party manufacturers through DIGSS and placed orders for spine products, sold spine products, and collected revenue from the sale of spine products that compete with those products sold by Plaintiffs.

28.     While employed by Plaintiffs, the Individual Defendants colluded and conspired with Plaintiffs' third-party contract manufacturers to prepare and order product for surgical cases the week following terminations of Individual Defendants' employment interfering with Plaintiffs' contract with such third-party manufacturers.

29.     Just prior to leaving, and while still employed by Plaintiffs, the Individual Defendants were distributing Plaintiffs' customer lists and customer information to third party spine product manufacturers for competing products that the Individual Defendants would be distributing once their employment with Plaintiffs was terminated.

30.     Stryker and RD Medical colluded with the Individual Defendants to manufacture, order, and deliver to Plaintiffs' customers the Stryker spine products that the Individual Defendants would need for surgeries the Monday following their Friday termination.

9

Exhibit 3
Page 9 of 53

31.     Prior to leaving, and while still employed by Plaintiffs, the Individual Defendants colluded with the Centinel Spine to order Centinel Spine products to be sold and distributed by the Individual Defendants to Plaintiffs' customers the Monday immediately following their Friday termination in direct violation of Plaintiffs contract with Centinel Spine.

32.     Defendants orchestrated every detail of their takeover of Plaintiffs' spine business down to their final acts.  Before the Individual Defendants sent in their resignations on Friday, August 12, 2022, they erased all the upcoming spine surgeries that had been scheduled by Plaintiffs' customers from Plaintiffs' electronic calendars putting patients, physicians, hospitals, and the Plaintiffs at great risk.  These calendars contained not only the times and dates of upcoming procedures, but also detailed information about the procedures and Plaintiffs' equipment and supplies needed for such procedures. Moreover, the Individual Defendants failed to return Plaintiffs' Spine Product inventory and supplies, or to notify Plaintiffs of its whereabouts.

33.     In what can only be described as a remarkable and seamless heist, the Individual Defendants successfully converted most of Plaintiffs' spine business before ever terminating their employment relationship with Plaintiffs.

34.     On Monday, August 15, 2022 – merely one business day after terminating their employment with Plaintiffs – the Individual Defendants, along with representatives of Stryker, RD Medical, and Summit Spine, were in surgeries with Plaintiffs' customers using Stryker Spine Products, Plaintiffs' ZimVie products (that they were no longer authorized to use), and Plaintiffs' third-party spine products – the same surgeries that were on Plaintiffs' calendars just days before. Such efficiency can only be accomplished through the planning and collusion of all Defendants.

Exhibit 3
Page 10 of 53

**ARGUMENT AND AUTHORITIES**

**I.      PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER.**

A temporary restraining order, or TRO, "may be granted without written or oral notice to the adverse party or the attorney for the adverse party … if … it clearly appears from specific facts shown by affidavit or by the verified petition that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or the attorney for the adverse party can be heard in opposition." 12 Okla. Stat. § 1384.1(B). The purpose of a TRO "is to restrain the defendant for what should be a very brief period, pending a hearing on the application for a temporary injunction, and it goes no further than to preserve the status quo until that determination, the status quo being the last actual, peaceable, noncontested status which preceded the pending controversy." *Kurtz v. Clark*, 2012 OK CIV APP 103, 290 P.3d 779, 786, citing *Neil v. Pennsylvania Life Ins. Co.*, 1970 OK 172, ¶ 16, 474 P.2d 961, 964–65. For the reasons set forth herein, both a TRO and a subsequent temporary injunction are warranted here.

Here, a TRO would preserve the *status quo* and prevent (further) irreparable harm to Plaintiffs. As discussed in more detail below, the amount of coordination and planning required between the Individual Defendants, Stryker, and the other Corporate Defendants for the Individual Defendants to resign on Friday at noon, delete all the calendar entries on Plaintiffs' systems for spine surgeries and procedures the following week, and be prepared with the equipment and personnel to replace Plaintiffs with Stryker in such procedures beginning on Monday morning is immense. Plaintiffs continue to collect data, but it is clear that the Individual Defendants coordinated this effort for months with Stryker and the other Defendants, disclosed confidential client data of Plaintiffs (mostly notably competitive pricing data) – even while still employed by Plaintiffs – and orchestrated a complete coup to solicit Plaintiffs' established customers to do

11

Exhibit 3
Page 11 of 53

business with Stryker and the other Defendants immediately upon the Monday morning following their Friday resignation. This business is highly driven by personal contacts and relationships, and in particular, specific knowledge of customer needs. The only way to prevent further irreparable harm to Plaintiffs is to issue a TRO to stop the bleeding temporarily, preventing the Individual Defendants from directly soliciting Plaintiffs' established customers and preventing both the Individual Defendants and Stryker from using Plaintiffs' confidential data and trade secrets to facilitate unfair competition.

## II.   PLAINTIFFS ARE ENTITLED TO A TEMPORARY INJUNCTION.

A temporary injunction may be granted where the plaintiff shows that it "is entitled to the relief demanded, and such relief, or any part thereof, consists in restraining the commission or continuance of some act, the commission or continuance of which, during the litigation, would produce injury to the plaintiff." 12 Okla. Stat. § 1382. While a TRO compels the parties to maintain the *status quo* until the Court can hear the question of whether or not a temporary injunction should issue, a temporary injunction is a "restraint which continues, unless modified by the court, until the hearing of the cause, and then it is made either permanent or discharged altogether." *Morse v. Earnest, Inc.*, 1976 OK 31, ¶ 12, 547 P.2d 955, 957.

"The purpose of a temporary injunction is to preserve the status quo and prevent the perpetuation of a wrong or the doing of an act whereby the rights of the moving party may be materially invaded, injured, or endangered." *See Edwards v. Bd. of Cnty. Comm'rs of Canadian Cnty.*, 2015 OK 58, ¶ 10, 378 P.3d 54, 58

To obtain a temporary injunction, a plaintiff must show that four factors weigh in its favor:

(1)   the likelihood of success on the merits;

(2)   irreparable harm to the party seeking the relief if the injunction is denied;

Exhibit 3
Page 12 of 53

(3)     plaintiff's threatened injury outweighs the injury the opposing party will suffer under the injunction; and

(4)     the injunction is in the public interest.

*Id.,* ¶ 12, 378 P.3d at 59. "Although all four criteria must be met before an injunction is issued, courts tend to focus most heavily upon the 'irreparable harm' requirement. One way in which courts assess irreparable harm is by determining whether a plaintiff has an adequate remedy at law." *Tulsa Order of Police Lodge No. 93 ex rel. Tedrick v. City of Tulsa*, 2001 OK CIV APP 153, ¶¶ 24-25, 39 P.3d 152, 158.

## A.     Plaintiffs are likely to succeed on the merits.

Plaintiffs are likely to succeed on the merits of their claims under the non-solicitation agreements between RX Medical and the Individual Defendants. The Employee Non-Compete Agreements entered between RX Medical and Individual Defendants Melton, Poos, and Cline, and the Confidentiality and Non-Competition Agreement entered between RX Medical and Individual Defendant Perry, each contain valid and enforceable restrictions against the solicitation of Plaintiffs' established customers. Oklahoma law specifically permits employers to enter agreements with employees that prevent them from directly soliciting the sale of goods and/or services from the employer's established customers upon termination of the employment relationship.

> A person who makes an agreement with an employer, whether in writing or verbally, not to compete with the employer after the employment relationship has been terminated, shall be permitted to engage in the same business as that conducted by the former employer or in a similar business as that conducted by the former employer as long as the former employee does not directly solicit the sale of goods, services or a combination of goods and services from the established customers of the former employer.

15 Okla. Stat. § 219A.

13

Exhibit 3
Page 13 of 53

The Employee Non-Compete Agreements between RX Medical and Individual Defendants Melton, Poos, and Cline prohibit them from directly or indirectly soliciting Plaintiffs' established customers. The Court may reform and enforce this agreement simply by deleting the word "indirectly." For example, in *Autry v. Acosta, Inc.*, 2018 OK CIV APP 8, ¶ 31, 410 P.3d 1017, 1024, the trial court issued an injunction, but recognized that the non-solicitation agreement needed to be reformed and could "be easily corrected" to comply with Section 219A by deleting the word "indirectly." The Court of Appeals found it was "not quite that simple" because the provision had other issues, in that it was not limited to established customers and was broader than "solicitation," covering also "promoting." To the contrary, and more similar to the facts here, in *Inergy Propane, LLC v. Lundy*, 2009 OK CIV APP 8, ¶ 37, 219 P.3d 547, 560, the Court of Appeals affirmed the grant of a preliminary injunction where the trial court properly found that a non-solicitation provision was enforceable as to "active solicitation," but could not be relied upon to prevent "accepting unsolicited business." Because the provision here otherwise complies with Section 219A, and Plaintiffs are only seeking to enjoin the Individual Defendants from actively soliciting the established customers, the Court can enforce it and reform it by deleting the word "indirectly."

The Confidentiality and Non-Competition Agreement entered between RX Medical and Individual Defendant Perry prohibits him from directly or indirectly soliciting Plaintiffs' established customers. Although the language is slightly broader than the other agreements, the Court may also reform and enforce this agreement simply by deleting the word "indirectly" and the phrase "engage in discussions or other communications with (regardless of who initiates such discussions or communications)." In doing so, the Court provide the injunctive relief Plaintiffs are seeking under *Inergy Propane* – an injunction preventing the Individual Defendants from actively soliciting its established customers.

14

Exhibit 3
Page 14 of 53

Plaintiffs are also likely to prevail on their claims of misappropriate of trade secrets under Oklahoma's Uniform Trade Secrets Act, 78 Okla. Stat. §§ 85-94 (the "UTSA"). To prove misappropriation of a trade secret, plaintiff must show "(i) the existence of a trade secret, (ii) misappropriation of the secret by defendants, and (iii) use of the secret to [plaintiff's] detriment." *MTG Guarnieri Mfg., Inc. v. Clouatre*, 2010 OK CIV APP 71, ¶ 12, 239 P.3d 202, 209. The Court may issue an injunction to prevent an actual or threatened misappropriation. 78 Okla. Stat. § 87(A).

Plaintiffs are also likely to prevail on their claim(s) of computer fraud and abuse under the Computer Fraud and Abuse Act, which prohibited Defendants' unauthorized access of Plaintiffs' computer systems/servers and resulted in damages and/or losses of "at least $5,000 in value" and the "potential modification or impairment of the medical...treatment or care of 1 or more individuals." Indeed, among the actions described in Plaintiffs' Petition, Defendants deleted information from Plaintiffs' computer system/servers regarding scheduled surgical procedures for patients in need of spine surgeries, including data related to the types of procedures being performed and the equipment and supplies needed. The Computer Fraud and Abuse Act provides that "any person who suffers damage or loss" as described by the act may maintain injunctive relief or other equitable relief from the Court. *See* 18 U.S.C. § 1030(g). Plaintiffs are entitled to injunctive relief and/or equitable relief.

While Plaintiffs are continuing to collect and review data regarding the Individual Defendants' acts both during and after their employment with Plaintiffs ended, it is clear that the Individual Defendants coordinated this effort for months with Stryker and the other Defendants, disclosed confidential client data of Plaintiffs (most notably competitive pricing data) – even while still employed by Plaintiffs – and orchestrated a complete coup to solicit Plaintiffs' established customers to do business with Stryker and the other Defendants immediately, including by deleting

15

Exhibit 3
Page 15 of 53

calendar entries regarding scheduled surgical procedures in Plaintiffs' system for the week following their resignation on Friday and being fully prepared to provide the equipment and services for such procedures on Monday.

**B.      Plaintiffs would suffer irreparable harm if a temporary injunction is not granted.**

As recognized by the Court of Appeals in *Inergy Propane*, the harm suffered by Plaintiffs here would be irreparable and cannot be compensated simply though money damages. The court's analysis there is persuasive:

> Although the profit associated with the business [defendant] improperly acquired and [plaintiff] therefore lost is capable of calculation, that amount would not fully compensate for the breach of these Agreements. First, as [plaintiff] pointed out at oral argument, it can determine which of its customers did business with [defendant] after his employment was terminated but not those who might have left [plaintiff] for a competitor as a result of [defendant's] alleged misuse of [plaintiff] sales tickets and disparagement. Second, lost profit is not necessarily a reasonable substitute for the business [plaintiff] lost. For example, lost profits would not account for the effect of diminished cash flow previously used to sustain payroll obligations.

*Inergy Propane*, 2009 OK CIV APP 8, ¶ 43, 219 P.3d at 561. As the Court of Appeals further recognized, it is for that reason that "injunctive relief has traditionally been granted in this context." *Id.*, ¶ 44, citing *Wall v. Chapman*, 1921 OK 367, 202 P. 303; *Herrington v. Hackler*, 1937 OK 720, 74 P.2d 388; *E.S. Miller Labs. V. Griffin*, 1948 OK 149, 194 P.2d 877.

Additionally, as the Tenth Circuit has held, issues involving unfair competition and use of confidential information and trade secrets necessarily impact customer goodwill and are difficult to calculate or compensate with money damages.

> A district court may find irreparable harm "based upon evidence suggesting that it is impossible to precisely calculate the amount of damage plaintiff will suffer." Oklahoma describes an injury as "irreparable when it is incapable of being fully compensated for in damages or where the measure of damages is so speculative that it would be difficult if not impossible to correctly arrive at the amount of the damages." **One such situation in which damages may not fully compensate a plaintiff is when the business at issue "is based on personal contacts and a**

16

Exhibit 3
Page 16 of 53

**knowledge of the special needs and requirements of customers, a fact which
complicates any damage estimate."**

*Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191–92 (10th Cir. 2009) (emphasis added)
(citations omitted).

The industry in which Plaintiffs compete absolutely fits the description the Tenth Circuit
provided in *Sw. Stainless*. This business is highly driven by personal contacts and relationships,
and in particular, specific knowledge of customer needs. Plaintiffs spent more than twenty (20)
years cultivating the relationship with spine physicians in the Oklahoma City area and building a
robust client base, focused on trust and goodwill. Plaintiffs have suffered and continue to suffer
irreparable harm to their goodwill and their customer relationships, which cannot be fully
compensated with money damages.

<blockquote>

**C.     The harm to Plaintiffs outweighs any potential harm to Defendants.**

</blockquote>

Conversely, while Plaintiffs will suffer irreparable harm the longer the Defendants are
permitted to unfairly compete and use their confidential data and trade secrets against them, there
is no harm to Defendants. Without immediate injunctive relief, Defendants will continue to benefit
from their misappropriation of trade secrets and other confidential data, computer fraud and abuse.
Requiring the Individual Defendants to comply with their legal obligations and preventing Stryker
and the other Defendants from unfairly profiting from the Individual Defendants' violations of
their legal obligations, contractual obligations and misappropriate Plaintiffs' trade secrets causes
them no legally cognizable harm. *See Fahr v. State ex rel. Adams*, 1951 OK 286, ¶12, 237 P.2d
128, 130 ("It is difficult to see how [defendants] are hurt by this injunction, as all it does is order
them to obey the law.").

Exhibit 3
Page 17 of 53

### D.     The temporary injunction is in the public interest.

Oklahoma law has made clear that reasonable restrictions on the exercise of trade are in the public interest and will be enforced. *Bayly, Martin & Fay, Inc. v. Pickard*, 1989 OK 122, 780 P.2d 1168, 1170–72; *see also Inergy Propane*, 2009 OK CIV APP 8, ¶¶ 44-45, 219 P.3d at 562. Only unreasonable restraints on trade are invalidated pursuant to 15 Okla. Stat. § 217. *See id.*; *see also Crown Paint Co. v. Bankston,* 1981 OK 104, 640 P.2d 948, 952; *Bd. of Regents of Univ. of Oklahoma v. Nat'l Collegiate Athletic Ass'n*, 1977 OK 17, 561 P.2d 499, 508. Accordingly, because the non-solicitation provisions found in the employment contracts of the Individual Defendants comply with Sections 217-219, they are reasonable. Issuance of a temporary injunction to protect Plaintiffs' interests in those reasonable restraints is in the public interest.

Respectfully submitted,

PATRICK R. PEARCE, JR., OBA #18802
JASON A. RYAN, OBA #18824
COREY A. NELLER, OBA #19534
**RYAN WHALEY**
400 North Walnut Avenue
Oklahoma City, Oklahoma 73104
(405) 239-6040
(405) 239-6766 FAX
jryan@ryanwhaley.com
rpearce@ryanwhaley.com
cneller@ryanwhaley.com
*Attorneys for Plaintiffs*

18

Exhibit 3
Page 18 of 53

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

| | |
|---|---|
| RX MEDICAL, LLC,<br>ROK SALES, LLC and<br>ROK MEDICAL MANAGEMENT, LLC | ) <br> ) <br> ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBEN MELTON, JUSTIN POOS,<br>BRADY CLINE, TODD PERRY,<br>SHELBY BULLARD, GREG MASON,<br>JOSHUA MCDONALD, KRISTY MOORE,<br>DIGSS INVESTMENTS, LLC,<br>STRYKER CORPORATION,<br>SUMMIT SPINE SOLUTIONS, LLC,<br>and RD MEDICAL, LLC, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| | ) |
| Defendants. | ) |

# CJ-2022-4032

Case No.

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

AUG 1 9 2022

RICK WARREN
COURT CLERK

126 _____

## VERIFIED PETITION

Plaintiffs, RX Medical, LLC, ROK Sales, LLC, and ROK Management, LLC ("Plaintiffs"), for their claims against Defendants, Roben Melton, Justin Poos, Brady Cline, Todd Perry, Shelby Bullard, Greg Mason, Joshua McDonald, Kristy Moore, DIGSS Investments, Inc., Stryker Corporation, Summit Spine Solutions, LLC, and RD Medical, LLC state as follows:

1.     Plaintiff, RX Medical, LLC is a domestic corporation with its principal place of business in Oklahoma County, State of Oklahoma.

2.     Plaintiff, ROK Sales, LLC is a domestic corporation with its principal place of business in Oklahoma County, State of Oklahoma.

3.     ROK Medical Management, LLC is a domestic corporation with its principal place of business in Oklahoma County, State of Oklahoma.

Exhibit 3<br>Page 19 of 53

4.     Plaintiffs, RX Medical, LLC, ROK Sales, LLC, and ROK Medical Management, LLC have common ownership and are all part of the RX Medical Family of Companies.

5.     Defendants, Rob Melton, Justin Poos, Brady Cline, Todd Perry, Shelby Bullard, Greg Mason, Joshua McDonald, Kristy Moore (hereinafter collectively referred to as "Individual Defendants") are citizens of the State of Oklahoma and each reside in Oklahoma County, State of Oklahoma.

6.     Defendant DIGSS Investments, LLC ("DIGSS") is a domestic corporation with its principal place of business in Oklahoma County, State of Oklahoma.

7.     Defendant Stryker Corporation ("Stryker") is a foreign corporation formed under the laws of a state other than Oklahoma.  Stryker does business in the State of Oklahoma and in Oklahoma County and can be found at their offices located at 1141 N. Robinson Avenue, Oklahoma City, Oklahoma 73103

8.     Defendant Summit Spine Solutions, LLC ("Summit Spine") is a domestic corporation with its principal place of business in Oklahoma County, State of Oklahoma.

9.     Defendant RD Medical, LLC is a domestic corporation with its principal place of business in Oklahoma County, State of Oklahoma.

10.     Plaintiffs provide marketing, sales, and distribution services to medical device manufacturers.  Plaintiffs have contractual agreements with medical product manufacturers to market, sell, and distribute the manufacturers' medical products to physicians, hospitals, and other healthcare facilities to be used in the medical and surgical treatment of patients.

11.     For more than twenty (20) years, Plaintiffs have worked to establish, and have established, relationships with physicians, medical groups, hospitals, and other healthcare providers within Oklahoma who purchase and use their medical products.

2

Exhibit 3
Page 20 of 53

12.     A large part of Plaintiffs' business is the marketing, sale, and distribution of spine products i.e., products used in the treatment of patients undergoing spine surgery.

13.     Plaintiffs have a complete line of spine products. That is to say that Plaintiffs carry every product that their spine surgeon or hospital customers needed to complete a spine surgery. Plaintiffs do this by contracting with several different product manufacturers to ensure there are no gaps in their line of spine products.

14.     During all times relevant herein, RX Medical had a contractual agreement with ZimVie, Inc. to market, sell, and distribute its spine products to spine surgeons practicing in Oklahoma. The ZimVie contract was Plaintiffs primary line of spine products.

15.     ZimVie, however, does not offer all products that Plaintiffs' spine surgeon and hospital customers may need in their spine surgeries. To fill the gaps in the ZimVie product line, Plaintiffs contracted with other third-party medical device manufacturers, including, but not limited to, Centinel Spine, Spineology, and Zavation. As a result, Plaintiffs have a complete and comprehensive line of spine products to offer its customers – the physicians and hospitals that purchase its products.

16.     Plaintiffs had a team of individuals employed to market, sell, distribute, and service its spine products ("Spine Team"). The Individual Defendants, Melton, Poos, Cline, Perry, Bullard, Mason, McDonald and Moore were the core of Plaintiffs Spine Team and were employed by Plaintiffs to market, sell and distribute its spine products.

17.     Plaintiffs' Spine Team was managed by Defendant Poos. Defendant Poos had two sales teams under him, one managed by Defendant Melton and the other by Defendant Cline. Defendants Melton and Cline each managed the other six (6) sales representatives, including Defendants Perry, Bullard, Mason, and McDonald. Moore was the operations manager over

revenue management, and inventory management.   All Individual Defendants participated in business management and strategic business planning for Plaintiffs.

18.    Through years of employment with Plaintiffs, the Individual Defendants were provided and gained knowledge of Plaintiffs' confidential trade secret information.   Such information includes, but is not limited to, strategic pricing information, customer lists, customer preference data, customer usage data, and market data, and distributorship/agency agreements.

19.    In consideration of and as a condition of RX Medical's employment of Defendants Melton, Poos, and Cline, each individually entered an Employee Non-Compete Agreement with RX Medical that prohibited Melton, Poos, and Cline, from soliciting RX Medical's existing customers for one (1) year following the termination of their employment.   Specifically, the Employee Non-Compete states:

> For Good consideration, and in consideration of my being employed, whether on a sub contract basis or as a full time employee, in whole or in part by RxMedical, I the undersigned agree that upon my termination of employment and notwithstanding the cause of termination, I shall not compete with the business of the Firm or its successors or assigns.
>
> The term "not compete" as used in this agreement shall mean that I shall not directly or indirectly, or in any capacity, on my own behalf or on behalf of any other firm undertake or assist in the solicitation of any client or account of the Firm existing during the course of my employment with Rx Medical.
>
> This non-compete agreement shall remain in full force and in effect for one year commencing with the date of employment termination.

See Ex. A, The Employee Non-Compete Agreements for Defendants Melton, Poos, and Cline (emphasis added).

20.    In consideration and as a condition of Defendant Perry's employment with RX Medical, Defendant Perry entered into a Confidentiality and Non-Competition Agreement with RX Medical.   Pursuant to the agreement, Perry agreed: (a) not to solicit any customer of RX Medical or Zimmer (now ZimVie) for a period of one (1) year following the termination of his

Exhibit 3
Page 22 of 53

employment with RX Medical; (b) not to solicit other RX Medical sales associates to terminate their relationship with RX Medical or ZimVie to become employed or associated with a competitor of RX Medical or ZimVie for a period of one (1) year following his termination; (c) not to compete with RX Medical or ZimVie in a defined geographical area for a period of one year; and (d) not to disclose certain confidential information of RX Medical and/or ZimVie for a period of five (5) years following termination of employment. *See* Ex. B, Confidentiality and Non-Competition Agreement between RX Medical and Defendant Perry.

21.     Defendant Stryker is a competitor of Plaintiffs and ZimVie.  Stryker manufacturers similar spine products to those manufactured by ZimVie.  Stryker also has a sales force that markets, sells, and distributes its spine products to physicians and hospitals in the treatment of patients undergoing spine surgery, making them a direct competitor of Plaintiffs in the Oklahoma market.

22.     Defendant RD Medical is an independent medical distributor that is contracted to distribute Defendant Stryker's spine products in the Oklahoma market.  Upon information and belief, Defendant RD Medical and/or also contracts with other third party device manufacturers for spine products to fill gaps in Stryker's spine product line.

23.     Defendant Summit Spine is a medical distributor that is contracted to distribute certain third-party Spine Products in the Oklahoma market.

24.     Upon information and belief, RD Medical and Summit Spine use the same sales representatives and work together to offer a complete line of spine products in the Oklahoma market and compete directly with Plaintiffs.

25.     At approximately 12:00 p.m. on Friday, August 12, 2022, Plaintiffs were notified by the Individual Defendants that they, and Plaintiffs entire Spine Team (save two newly hired

Exhibit 3
Page 23 of 53

individuals), were terminating their relationship with Plaintiffs effective that day at 5:00 p.m. central time.

26.    The Individual Defendants left Plaintiffs' employment to become employees of Stryker and to distribute Stryker's spine products in the Oklahoma market.   The Individual Defendants are also working for or with Defendant Summit Spine to contract with third parties to distribute supplemental spine products – the same third-party manufacturers that have contracts with Plaintiffs.

27.    For several months prior to the termination of the Individual Defendants' employment with Plaintiffs, the Defendants worked in concert to develop and execute a scheme intended to overtake and destroy Plaintiffs' spine business.

28.    For several months prior to the termination of their employment with Plaintiffs, the Individual Defendants colluded and conspired with Stryker and RD Medical, to steal Plaintiffs' customers (physicians and hospitals) and convert those customers from the ZimVie's spine product line to Stryker's spine product line.

29.    The Individual Defendants actively solicited Plaintiffs' customers to switch from the ZimVie spine products to Stryker's spine products both before and after their employment with Plaintiffs ended.

30.    For several months prior to the termination of their employment with Plaintiffs, the Individual Defendants colluded and conspired with Summit Spine, DIGSS, and/or other affiliate entities to take many, if not all, of the third-party contracts or replace it with other competing third-party contracts for the supplemental spine products held by Plaintiffs.

31.    The Individual Defendants was working in concert with Summit Spine, and/or DIGSS, and/or other affiliate entities to actively solicited manufacturers that Plaintiffs had third-

Exhibit 3
Page 24 of 53

party contracts with to switch those contracts to Summit Spine, DIGSS, other affiliate entities and/or themselves individually. This solicitation occurred both before and after their employment with Plaintiffs ended.

32.     Part of the Individual Defendants job with Plaintiffs was to work with Plaintiffs' hospital customers to negotiate and set pricing for Plaintiffs' spine products. The Individual Defendants accessed and used Plaintiffs' pricing to begin competing with Plaintiffs while still employed. Specifically, while still employed with Plaintiffs, Defendants surreptitiously submitted pricing bids to Plaintiffs' hospital customers on spine products that the Individual Defendants would be distributing after leaving their employment with Plaintiffs. These are spine products that compete directly with those offered by Plaintiffs. The Individual Defendants used Plaintiffs' pricing to match the pricing on the bids for the competing products.

33.     While employed by Plaintiffs, Defendant Poos, Defendant Melton, Defendant Cline, and Defendant Moore colluded to contract with third-party manufacturers through DIGSS and placed orders for spine products, sold spine products, and collected revenue from the sale of spine products that compete with those products sold by Plaintiffs.

34.     While employed by Plaintiffs, the Individual Defendants colluded and conspired with Plaintiffs' third-party contract manufacturers to prepare and order product for surgical cases the week following terminations of Individual Defendants' employment interfering with Plaintiffs' contract with such third-party manufacturers.

35.     Just prior to leaving, and while still employed by Plaintiffs, the Individual Defendants were distributing Plaintiffs' customer lists and customer information to third party spine product manufacturers for competing products that the Individual Defendants would be distributing once their employment with Plaintiffs was terminated.

7

Exhibit 3
Page 25 of 53

36.     Stryker and RD Medical colluded with the Individual Defendants to manufacture, order, and deliver to Plaintiffs' customers the Stryker spine products that the Individual Defendants would need for surgeries the Monday following their Friday termination.

37.     Prior to leaving, and while still employed by Plaintiffs, the Individual Defendants colluded with the Centinel Spine to order Centinel Spine products to be sold and distributed by the Individual Defendants to Plaintiffs' customers the Monday immediately following their Friday termination in direct violation of Plaintiffs contract with Centinel Spine.

38.     Defendants orchestrated every detail of their takeover of Plaintiffs' spine business down to their final acts.  Before the Individual Defendants sent in their resignations on Friday, August 12, 2022, they erased all the upcoming spine surgeries that had been scheduled by Plaintiffs' customers from Plaintiffs' electronic calendars putting patients, physicians, hospitals, and the Plaintiffs at great risk.  Moreover, the Individual Defendants failed to return Plaintiffs' Spine Product inventory or notify Plaintiffs of its whereabouts.

39.     In what can only be described as a remarkable and seamless heist, the Individual Defendants successfully converted most of Plaintiffs' spine business before ever terminating their employment relationship with Plaintiffs.

40.     On Monday, August 15, 2022 — merely one business day after terminating their employment with Plaintiffs — the Individual Defendants along with representatives of Stryker, RD Medical, and Summit Spine were in surgeries with Plaintiffs' customers using Stryker Spine Products, Plaintiffs' ZimVie products (that they were no longer authorized to use) and Plaintiffs' third-party spine products — the same surgeries that were on Plaintiffs' calendars just days before. Such efficiency can only be accomplished through the planning and collusion of all Defendants.

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

41.     Plaintiff, RX Medical, adopts and incorporates herein paragraphs 1 through 40 above and further alleges and states a cause of action for breach of contract against Defendants Melton, Poos, Cline, and Perry as follows:

42.     In consideration of and as a condition of RX Medical's employment of Melton, Poos, Cline, and Perry, each of these individuals entered a non-compete agreement with RX Medical.  *See* Ex. A & B.  The non-compete agreements that Melton, Poos, Cline, and Perry individually entered with RX Medical are binding contracts under Oklahoma law.

43.     Pursuant to the terms of the non-compete agreements, Defendants Melton, Poos, Cline, and Perry each agreed not to solicit any client or account of RX Medical for a period of one (1) year following the termination of their employment.

44.     In the non-compete agreement between Defendant Perry and RX Medical, Defendant Perry additionally agreed not to (a) solicit RX Medical's sales associate to become employed by a competitor for a period of one (1) year following the termination of his employment; (b) not to compete with RX Medical or ZimVie in a defined geographical location for a period of one (1) year; and (c) not to disclose certain confidential information of RX Medical and/or ZimVie for a period of five (5) years following termination of employment.

45.     Defendants Melton, Poos, and Cline breached the terms of their respective non-compete agreements with RX Medical by soliciting RX Medical's customers before one (1) year had expired from the date of the termination of their employment.

46.     Defendant Perry breached the terms of his non-compete agreement with RX Medical by within one (1) year of the termination of his employment: (a) soliciting RX Medical's

Exhibit 3
Page 27 of 53

customers; (b) soliciting RX Medical's sales associates to work for a competitor; and (c) competing with RX Medical in the Oklahoma market. Defendant Perry further breached the terms of his non-compete agreement by disclosing confidential information of RX Medical within five (5) years of the termination of his employment.

47.     Plaintiff, RX Medical, has been damaged as a direct and proximate result of Melton, Poos, Cline, and Perry's breach of their respective non-compete agreements. Such damages exceed $75,000.00, exclusive of interest, attorney fees, and costs.

## SECOND CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

48.     Plaintiffs adopt and incorporate herein paragraphs 1 through 47 above and further allege and state a cause of action for breach of fiduciary duty against the Individual Defendants as follows:

49.     A fiduciary relationship existed between Plaintiffs and the Individual Defendants.

50.     The Individual Defendants as senior-level managers and senior-level employees and agents of Plaintiffs owed certain fiduciary duties to Plaintiffs, including, but not limited to:

a.     duty to act primarily for the benefit of Plaintiffs while working in the course and scope of their employment/agency;

b.     duty of good faith;

c.     duty of loyalty;

d.     duty to act in the best interest of Plaintiffs;

e.     duty to use a degree of care that an ordinary person would use under similar circumstances;

f.     duty to protect confidential, trade secret and/or proprietary information;

g.     duty to protect Plaintiffs' property, including its business information, records, documents, scheduled deliveries and services;

10

Exhibit 3
Page 28 of 53

      h.    duty to protect Plaintiffs' business contracts, expectations and reputation; and

      i.    duty to protect Plaintiffs' economic advantages and economic expectations.

51.    As described herein, the Individual Defendants breached each of these duties owed to Plaintiffs, and did so, intentionally, maliciously and with the intent to harm Plaintiffs.

52.    Plaintiffs have been damaged as a direct and proximate result of the Individual Defendants breach of their fiduciary duties to them. Such damages exceed $75,000.00, exclusive of interest, attorney fees, and costs.

53.    The Individual Defendants' conduct alleged herein was gross, willful and/or wanton, such that punitive or exemplary damages should be imposed in Plaintiffs' favor and against the Individual Defendants in amounts exceeding $75,000.00, exclusive of interest, attorney fees, and costs.

## THIRD CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH CONTRACTUAL OR BUSINESS RELATIONS AND/OR WITH PROSPECTIVE ECONOMIC ADVANTAGE

54.    Plaintiffs adopt and incorporate herein paragraphs 1 through 53 above and further allege and state a cause of action for tortious interference with contractual or business relations against all Defendants as follows:

55.    Plaintiffs reasonably expected to continue to market, sell, distribute, and supply medical devices and products to physicians and hospitals pursuant to the contracts described herein. Defendants knew of Plaintiffs' business relationships with medical device manufacturers, medical product manufacturers physicians and hospitals.

Exhibit 3
Page 29 of 53

56.   Defendants intentionally and maliciously prevented the Plaintiffs from continuing and/or fulfilling their business relationships and contracts with device suppliers, device manufacturers, physicians and hospitals.

57.   As described above, Defendants used improper and/or unfair means to prevent Plaintiffs from continuing business relationships with manufacturers, physicians, and hospitals.

58.   Defendants were aware that RX Medical had a contract with ZimVie to market, sell and distribute ZimVie's Spine Products to its customers.

59.   The Individual Defendants tortiously interfered with the ZimVie Contract and tortiously interfered with the business relations that RX Medical had with its established customers when they (a) wrongfully solicited RX Medical's customers away from RX Medical while still employed by RX Medical and working within the scope of their employment; (b) wrongfully solicited RX Medical's customers to change from ZimVie's spine products to Stryker's spine products while employed by RX Medical and working within the course and scope of their employment; (c) erased the scheduled surgical procedures from the RX Medical calendars, in an effort to prevent RX Medical from servicing RX Medical customers in the days following their resignation; and (d) failed to return or disclose the location of ZimVie inventory upon the termination of their employment thereby precluding that inventory from being used for RX Medical customers in the days following their termination.

60.   Stryker and RD Medical interfered with the RX Medical's contracts and business relations when it conspired with and induced the Individual Defendants to actively solicit RX Medical's Customers while the Individual Defendants were employed by and working within the course and scope of their employment with Plaintiffs.

Exhibit 3
Page 30 of 53

61.     At all material times herein, Stryker was aware that Defendants Melton, Poos, Cline, and Perry were contractually prohibited from soliciting RX Medical's existing customers for one (1) year following the termination of their employment with RX Medical. Despite this, Stryker conspired with and wrongfully induced Melton, Poos, Cline, and Perry to solicit RX Medical's Customers both before and after Melton, Poos, Cline and Perry terminated their relationship with RX Medical.

62.     At all material times herein, Stryker was aware that Defendant Perry was also contractually prohibited from (a) soliciting RX Medical's sales associates to work for a competitor, (b) competing with RX Medical in the Oklahoma market and disclosing or using confidential information of RX Medical following his termination. Despite this, Stryker conspired with and wrongfully induced Perry to breach these contractual provisions.

63.     The Individual Defendants, DIGSS and Summit Spine were aware of the third-party contracts for supplemental spine products held by Plaintiffs. Including, but not limited to Plaintiffs' third-party contracts with Centinel Spine, Spineology, and Zavation. The Individual Defendants and Summit Spine tortiously interfered with the above referenced third-party contracts by contacting the Centinel Spine, Spineology, and Zavation before and after the Individual Defendants' employment ended with Plaintiffs to persuade them to move their business to the Individual Defendants and/or Summit Spine.

64.     The Defendants used improper, wrongful and unfair means in the interference with the contractual and business relations of Plaintiffs.

65.     Defendants intended to interfere with or were substantially certain that their actions would interfere with Plaintiffs' contracts with medical device suppliers, and medical device manufacturers.

13

Exhibit 3
Page 31 of 53

66.     Plaintiffs suffered damages as a direct and proximate result of Defendants interference with the contractual and business relations of the Plaintiffs.  Such damages exceed $75,000.00, exclusive of interest, attorney fees and costs.

67.     The Defendants' conduct alleged herein was gross, willful and/or wanton, such that punitive or exemplary damages should be imposed in Plaintiffs' favor and against the Defendants in amounts exceeding $75,000.00, exclusive of interest, attorney fees, and costs.

<u>**FOURTH CAUSE OF ACTION**</u>

**MISAPPROPRIATION OF TRADE SECRETS**

68.     Plaintiffs adopts and incorporates herein paragraphs 1 through 67 above and further alleges and states a claim for misappropriation of trade secrets against Defendants as follows:

69.     As part of their employment, Defendants had access to Plaintiffs' trade secrets, including, but not limited to, strategic pricing information, customer lists, customer preference data, customer usage data, market data, and contracts with manufacturers and hospitals.

70.     Plaintiffs' trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic benefit value from its disclosure or use.

71.     Plaintiffs take reasonable efforts to maintain the secrecy of their trade secrets.

72.     The Individual Defendants misappropriated Plaintiffs trade secrets both before and after terminating their employment with Plaintiffs in various ways, including, but not limited to: (a) using plaintiffs strategic pricing to provide bids to Plaintiffs' customers on products that compete with Plaintiffs; and (b) using Plaintiffs' customer lists and customer preference and usage data and terms of all manufacturing contracts to compete with Plaintiffs and providing such data to third parties for competition against Plaintiffs.

Exhibit 3
Page 32 of 53

73.     The misappropriation of Plaintiffs' trade secrets has been used by Defendants and other third parties, including Stryker, RD Medical, Summit Spine, and Centinel Spine to their advantage and to Plaintiffs' detriment.

74.     Plaintiffs are entitled to injunctive relief and other equitable relief as contemplated the Uniform Trade Secrets Act.

75.     Plaintiffs have been damaged by the Individual Defendants' misappropriation of Plaintiffs' trade secrets. Such damages exceed $75,000.00, exclusive of interest, attorney fees and costs.

76.     The Individual Defendants' conduct alleged herein was willful and malicious, such that punitive or exemplary damages should be imposed in Plaintiffs' favor and against the Individual Defendants in amounts exceeding $75,000.00, exclusive of interest, attorney fees, and costs, as contemplated by the Uniform Trade Secrets Act.

## FIFTH CAUSE OF ACTION

### VIOLATION OF COMPUTER FRAUD AND ABUSE ACT

77.     Plaintiffs adopt and incorporate herein paragraphs 1 through 76 above and further allege and state a claim for Violation of Computer Fraud and Abuse Act against each Defendant.

78.     Plaintiffs utilized their computers/servers/systems to market, sell and distribute spine products to physicians, hospitals, and other healthcare facilities in states other than Oklahoma and therefore the computers/servers/systems were actively being used in interstate commerce at all relevant times.

79.     The Individual Defendants accessed Plaintiffs computers/servers/system connected to the internet and used in interstate commerce.

Exhibit 3
Page 33 of 53

80.     Upon information and belief, Stryker, Summit Spine, and RD Medical, through the Individual Defendants, accessed Plaintiffs' computers/servers/system connected to the internet and used in interstate commerce.

81.     The Individual Defendants exceeded their authority to access Plaintiffs' computers/servers/system.

82.     Stryker, Summit Spine, and RD Medical did not have authority to access, delete, destroy and/or distribute information from Plaintiffs' computers/servers/system.

83.     Upon information and belief, Defendants intentionally and knowingly accessed Plaintiffs' computers/servers/systems and without authority caused information to be wiped, removed and/or inaccessible to Plaintiffs.

84.     Defendants intentionally and knowingly exceeded their authorized access to Plaintiffs' computers/servers/systems to comment and/or further their interference with Plaintiffs' business, contracts and economic expectations, obtain valuable information and destroy valuable business (proprietary and/or trade secret) property.

85.     Defendants caused harm to Plaintiffs' computers/serves/systems by deleting information necessary for Plaintiffs to conduct business and, in fact, Defendants actions precluded Plaintiffs' from conducting business.

86.     Defendants transferred or caused to be transferred Plaintiffs' business information and records and then deleted information from Plaintiffs' computers/servers/systems.

87.     Defendants undertook these actions for their personal financial gain and commercial advantage.

88.     Defendants impaired the integrity and/or availability of electronic information, data and/or computers/servers/systems.

Exhibit 3
Page 34 of 53

89.     Defendants' actions potentially impaired the medical treatment or care of one or more individuals by threatening Plaintiffs' ability to deliver necessary medical devices and/or supplies.

90.     Plaintiffs' losses are in excess of $5,000 in less than one year, including the costs to investigate Defendants' unauthorized access.

91.     As a result of Defendants violation of the Computer Fraud and Abuse Act, Plaintiffs have sustained economic losses in excess of $75,000.00, exclusive of interest, attorney fees, and costs.

92.     Plaintiffs are entitled to injunctive relief and other equitable relief as contemplated by the Computer Fraud and Abuse Act.

## SIXTH CAUSE OF ACTION

### CIVIL CONSPIRACY

93.     Plaintiffs adopt and incorporate herein paragraphs 1 through 92 above and further allege and state a claim for civil conspiracy against all Defendants as follows:

94.     Defendants colluded and conspired to wrongfully and tortiously interfere with Plaintiffs' contracts and business relations for the purpose of acquiring their entire spine business and all of the employees in their Spine Department.

95.     Defendants carried out their conspiracy through the unlawful means of tortiously interfering with Plaintiffs' contracts and business relations.

96.     Plaintiffs suffered damages as a direct and proximate result of Defendants civil conspiracy.  Such damages exceed $75,000.00, exclusive of interest, attorney fees, and costs.

Exhibit 3
Page 35 of 53

97.    Defendants conduct alleged herein was gross, willful and/or wanton, such that punitive or exemplary damages should be imposed in Plaintiffs favor and against the Individual Defendants in amounts exceeding $75,000.00, exclusive of interest, attorney fees, and costs.

Wherefore, premises considered, Plaintiffs seek judgment against each Defendant based on the causes of action set forth above in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) for actual or compensatory damages and seeks punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), injunctive and equitable relief, attorney fees, court costs, and for such other and further relief as to which the Court determines Plaintiffs are entitled.

Respectfully submitted,

Jason A. Ryan, OBA # 18824
Patrick R. Pearce, Jr., OBA # 18802
Corey A. Neller, OBA # 19534

Of the Firm:

RYAN WHALEY
400 North Walnut Avenue
Oklahoma City, Oklahoma 73104
Telephone:    (405) 239-6040
Facsimile:    (405) 239-6766
jryan@ryanwhaley.com
ppearce@ryanwhaley.com
cneller@ryanehaley.com

**JURY TRIAL DEMANDED**

Exhibit 3
Page 36 of 53

## VERIFICATION

STATE OF OKLAHOMA      )
                                )   ss:
COUNTY OF OKLAHOMA  )

     I, Greg Oplotnik, of lawful age, state under penalty of perjury under the laws of Oklahoma that I have personal knowledge of the allegations made in the Plaintiffs' Verified Petition, and that the allegations made therein are true and correct to the best of my knowledge.


_____
Greg Oplotnik
RX Medical, LLC, Manager
ROK Sales, LLC, Manager
ROK Medical Management, LLC, Manager


     Subscribed and sworn to before me this _19TH_ day of _AUGUST_, 2022.

_____
Notary Public


My Commission Expires:

_1·13·24_

My Commission No.:

_20000459_

HEATHER WARD COOK
NOTARY PUBLIC
Commission #
20000459
My Commission
Expires 01-13-2024
STATE OF OKLAHOMA

Exhibit 3
Page 37 of 53

Employee Non-Compete Agreement
For
RxMedical

For Good consideration, and in consideration of my being employed, whether on a sub contract basis or as a full time employee, in whole or in part by RxMedical, I, the undersigned agree that upon my termination of employment and notwithstanding the cause of termination, I shall not compete with the business of the Firm or its successors or assigns.

The term "not compete" as used in this agreement shall mean that I shall not directly or indirectly, or in any capacity, on my own behalf or on the behalf of any other firm undertake or assist in the solicitation of any client or account of the Firm existing during the course of my employment with RxMedical.

This non-compete agreement shall remain in full force and in effect for one year commencing with the date of employment termination.

Signed under seal this 9th day of Nov. , 20 06

Notary Name _____
Seal Expires 3/13/2010

[Notary seal: SANDRA A. BECK NOTARY PUBLIC #06002704 EXP. 03/13/10 STATE OF OKLAHOMA]

Employee _____

Rob Mellon

Employee Non-Compete Agreement
For
RxMedical

For Good consideration, and in consideration of my being employed, whether on a sub
contract basis or as a full time employee, in whole or in part by RxMedical, I, the
undersigned agree that upon my termination of employment and notwithstanding the
cause of termination, I shall not compete with the business of the Firm or its successors
or assigns.

The term "not compete" as used in this agreement shall mean that I shall not directly or
indirectly, or in any capacity, on my own behalf or on the behalf of any other firm
undertake or assist in the solicitation of any client or account of the Firm existing during
the course of my employment with RxMedical.

This non-compete agreement shall remain in full force and in effect for one year
commencing with the date of employment termination.

Signed under seal this 30 day of ~~~~Oct~~~~ , 2006

Notary Name Sandra A. Beck
Seal Expires 3/13/2010

Employee Justin Pitts

Employee Non-Compete Agreement
For
RxMedical

For Good consideration, and in consideration of my being employed, whether on a sub contract basis or as a full time employee, in whole or in part by RxMedical, I, the undersigned agree that upon my termination of employment and notwithstanding the cause of termination, I shall not compete with the business of the Firm or its successors or assigns.

The term "not compete" as used in this agreement shall mean that I shall not directly or indirectly, or in any capacity, on my own behalf or on the behalf of any other firm undertake or assist in the solicitation of any client or account of the Firm existing during the course of my employment with RxMedical.

This non-compete agreement shall remain in full force and in effect for one year commencing with the date of employment termination.

Signed under seal this  2  day of  February  , 20 04

Notary Name    *Valerie C. Tipps*
Seal Expires

Employee

*Brady Cline*

Exhibit 3
Page 40 of 53

## CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

**THIS AGREEMENT** (this "Agreement") is entered into as of the 1st day of March, 2013 (the "Effective Date"), by and between RX Medical, LLC located at 409 East California Avenue, Oklahoma City, OK 73104 ("Representative"), and Todd Perry ("Associate").

### RECITALS:

**WHEREAS,** Associate is an employee for Representative, which operates a business involved in the sale of orthopedic implants and devices and related products, services and supplies located at 409 E. California Ave., Oklahoma City, OK 73104 (the "Business");

**WHEREAS,** Representative is a sales representative for Zimmer US, Inc. ("Zimmer") and has the right and obligation to solicit orders for certain orthopedic implants and devices and other medical products, services and supplies of Zimmer and/or its affiliates ("Products") within a certain geographic area described in Representative's agreement with Zimmer ("Company Territory");

**WHEREAS,** Associate desires to continue performing services for the Business in that portion of the Company Territory described in Exhibit 1 (the "Territory");

**WHEREAS,** doctors, hospitals, insurers and others ("Customers") purchase the Products under arrangements whereby the sale of the Products is made directly by Zimmer to the Customers;

**WHEREAS,** in connection with Representative's status as a sales representative for Zimmer, Representative has access to confidential and proprietary information of Zimmer;

**WHEREAS,** in the course of providing services for Representative, Associate will have access to confidential, proprietary and trade secret information of Representative and Zimmer;

**WHEREAS,** Representative has a contractual obligation to protect and preserve Zimmer's confidential, proprietary and trade secret information and desires to protect its own confidential, proprietary and trade secret information;



EXHIBIT
**B**
Exhibit 3

WHEREAS, during the course of Associate's relationship with Representative, Associate will receive training (the "Training") relating to the Products and surgery procedures, and other training that will substantially improve Associate's job skills and employment prospects;

WHEREAS, Representative and/or Zimmer will incur substantial costs in providing the Training to Associate; and

WHEREAS, Representative is willing to provide the Training to Associate only on the express condition that Associate enter into this Agreement;

NOW, THEREFORE, in consideration of the covenants and mutual agreements set forth herein and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1. Confidentiality and Non-Disclosure.

a. For purposes of this Agreement, the term "Confidential Information" means and includes any and all of Representative's and/or Zimmer's non-public information and data of or about Representative and/or Zimmer and their businesses, confidential and proprietary information, and trade secrets, including, but not limited to, the following: (i) all information not generally known or used by the competitors of Representative or Zimmer and which gives Representative or Zimmer a competitive advantage in the marketplace or could otherwise be harmful to Representative or Zimmer if disclosed without authorization; (ii) all "protected health information" as defined by HIPAA, including, but not limited to, any medical records or patient information that may be used to identify any particular patient; (iii) marketing, sales, and advertising information including: lists of actual or potential Customers; Customer preference data; marketing and sales techniques, strategies, efforts, and data; merchandising systems and plans; confidential Customer information including identification of purchasing personnel, account status, needs and ability to pay; business plans; product development and delivery schedules; market research and forecasts; marketing and advertising plans, techniques, and budgets; overall pricing strategies; the specific advertising programs and strategies utilized, and the success or lack of success of those programs and strategies; (iv) organizational information including: personnel and salary data; merger, acquisition and expansion information; and

Exhibit 3
Page 42 of 53

information concerning methods of operation; (v) financial information such as: product costs; supplier information; overhead costs; profit margins; banking and financing information; and pricing policies; (vi) technical information including: product specifications, improvements, discoveries, developments, designs, inventions, techniques, and new products; (vii) information of third parties provided to Representative and/or Zimmer subject to nondisclosure restrictions for use in Representative's business for Zimmer; and (viii) all Customer lists and Customer information. Confidential Information does not include information which becomes generally known other than through disclosure (whether deliberate or inadvertent) by Associate or another person who has an obligation of confidentiality to Representative or Zimmer.

      b. In consideration of Representative providing the Training to Associate, during the term of Associate's relationship with Representative and for the Restricted Period (defined below), Associate will not reveal, report, publish, disclose or transfer any of the Confidential Information to any person or entity or use any of the Confidential Information for any purpose other than disclosure to authorized employees and agents of Representative or Zimmer or such other third parties who need such information in furtherance of Representative's or Zimmer's business and who are bound to maintain the confidentiality of the Confidential Information. The "Restricted Period" shall mean (i) five (5) years from the date of the expiration or termination of Associate's relationship with Representative (for whatever reason) if the item of Confidential Information at issue does not constitute a "trade secret" under applicable law, or (ii) indefinitely, if the item of Confidential Information at issue constitutes a "trade secret" under applicable law. Furthermore, Associate will notify Representative in writing of any circumstances surrounding any unauthorized use or knowledge of Confidential Information. The restrictions contained in this Section 1 shall not apply to disclosure of Confidential Information in judicial or administrative proceedings to the extent Associate is legally compelled to disclose such information, provided Associate shall have used his/her best efforts to, and shall have afforded Representative and Zimmer the opportunity to, obtain an appropriate protective order or other assurance satisfactory to Representative and Zimmer of confidential treatment for the information required to be disclosed.

Exhibit 3
Page 43 of 53

c. Associate will adopt and implement all procedures prescribed from time to time by Representative to prevent unauthorized copying, use and disclosure of Confidential Information, and will otherwise maintain the secrecy of Confidential Information.

d. Any and all Confidential Information that Associate uses or creates or to which Associate has had access in the course of Associate's relationship with Representative, including any copies, excerpts and summaries thereof (whether maintained in written, printed, or electronic form) is, and shall at all times remain Representative's or Zimmer's sole and exclusive property. Associate waives and otherwise agrees to transfer to Representative any right, title, or interest Associate may have in such Confidential Information without further compensation.

e. Immediately upon expiration or termination of Associate's relationship with Representative (for whatever reason), Associate will return to Representative all of Representative's and Zimmer's papers, documents and things (and copies thereof), which are in Associate's possession or under Associate's control regardless whether such papers, documents or things contain Confidential Information.

f. Nothing in this Section 1 shall be deemed to prohibit Associate's use of his or her general know-how, as such term "know-how" is defined under applicable law, as long as such use does not require use of any trade secret as protected under applicable law.

## 2. Exclusive Relationship.

In consideration of Representative providing the Training to Associate, during Associate's relationship with Representative Associate will not, directly or indirectly, through any other person or entity, on his/her own account, or as an employee, independent contractor, agent, sales associate, consultant, partner, owner, officer, director or stockholder of any other person, partnership, corporation or other entity:

a. have any interest (other than an ownership interest of one percent (1%) or less in a publicly traded company) in or provide services for any business other than Representative, wherever located or operating, that manufactures, distributes, markets, sells or promotes orthopedic implants or devices or related medical products, services, instruments, or supplies; or

Exhibit 3
Page 44 of 53

b. solicit, attempt to solicit or engage in discussions or other communications with any party with the purpose or intent of promoting, selling or obtaining orders for any orthopedic implants or devices or related medical products, services, instruments, or supplies other than soliciting orders and servicing accounts for the purchase of the Products in accordance with policies and procedures of Zimmer and Representative; or

c. engage in any business or activity that is competitive with the business of Representative and/or Zimmer, or make any preparations to engage in such competitive business or activities.

### 3. Covenant Not to Solicit Customers.

In consideration of the Representative providing the Training to Associate, for a period of twelve (12) months beginning on the later of (a) termination or expiration of Associate's or Zimmer's relationship with Representative for any reason, or (b) the date on which Associate begins to comply with this Section 3, Associate shall not (except with the prior written consent of Representative and Zimmer), directly or indirectly, on Associate's own behalf, or on behalf of any person, firm, corporation or other business or legal entity, solicit, attempt to solicit or engage in discussions or other communications with (regardless of who initiates such discussions or communications), any Restricted Customer (defined below) with the purpose or intent of promoting, selling or obtaining orders for any orthopaedic implants or devices or related medical products, services, instruments or supplies. A "Restricted Customer" is any person, firm, corporation or other business or legal entity which, during any part of the twenty-four (24) months period immediately preceding the expiration or termination of Associate's relationship with Representative:

a. (i) was an actual Customer of Representative, Zimmer, or an affiliate thereof, (ii) participated in or influenced the purchasing decisions of any actual Customer of Representative, Zimmer, or an affiliate thereof, or (iii) used the Products purchased by any actual Customer of Representative, Zimmer, or an affiliate thereof; and

b. was solicited or serviced directly or indirectly by Associate during his/her relationship with Representative or for which Associate had any sales or service responsibility or contact during his/her relationship with Representative.

Exhibit 3
Page 45 of 53

For purposes of Subsection (a) in this Section 3, the term "Products" includes any orthopaedic implants, devices, or related medical products, instruments, services, or supplies sold, marketed, or promoted by Representative or Associate during any part of the twenty-four (24) month period immediately preceding the termination or expiration of Associate's or Zimmer's relationship with Representative.

Associate acknowledges that Representative and Zimmer have legitimate interests in protecting and preserving the Confidential Information. Associate acknowledges that Customers have regular and repeated dealings with Representative and Zimmer which result in systematic sales and business relations, and that Representative and Zimmer receive habitual and consecutive business from Customers to such an extent that Representative and Zimmer have a near-permanent relationship with Customers. Associate also acknowledges that the Confidential Information (including, without limitation, customers lists and contacts) is not a matter of public or general knowledge, has been developed by Representative or Zimmer at substantial cost and expense, and is extremely valuable and could not be easily replicated.

**4. Covenant Not to Solicit Other Sales Associates.**

In consideration of the Representative providing the Training to Associate, for a period of twelve (12) months immediately following (a) the expiration or termination of Associate's relationship with Representative for any reason or (b) Representative's relationship with Zimmer, Associate shall not (except with the prior written consent of Representative and Zimmer), directly or indirectly, on Associate's own behalf, or on behalf of any other person, firm, corporation or business entity, solicit or have discussions or other communication (regardless of who initiates such discussions or communications) with any sales associate of Representative, any sales associate of another sales representative of Zimmer, or any sales associate, employee or agent of Representative or any sales representative, employee or agent of Zimmer, for the purpose of causing that person to terminate its relationship with its employer or principal to become employed or associated with a competitor of Representative, another sales representative of Zimmer, or Zimmer: (i) in a capacity similar to the capacity in which that person performed services for Representative, another sales representative of Zimmer, or Zimmer, or (ii) in a capacity where that person's knowledge of the Confidential Information

Exhibit 3
Page 46 of 53

would be useful to the competitor and/or detrimental to Representative, another sales
representative of Zimmer, or Zimmer.

**5. Covenant Not to Compete.**

      In consideration of Representative providing the Training to Associate, during
Associate's relationship with Representative and for a period of twelve (12) months beginning
on the later of (a) the expiration or termination of Zimmer's or Associate's relationship with
Representative for any reason or (b) the date on which Associate begins to comply with this
Section 5, Associate shall not (except with the prior written consent of Representative and
Zimmer), directly or indirectly, on Associate's own behalf, or on behalf of any person, firm,
corporation or other business or legal entity, have any interest in, provide services for or engage
in any Competitive Business located, operating or offering or selling Products within the
Restricted Geographic Area (a) in the same or similar capacity or function to that in which
Associate worked for or provided services to Representative, (b) in any sales or marketing
capacity or function, (c) in any business development capacity or function, (d) in any customer
relationship capacity or function or (e) in any capacity in which Associate's knowledge of
Zimmer's Confidential Information would facilitate or support Associate's work for the
Competitive Business. For purposes of this Agreement, the term "Restricted Geographic Area"
means and includes (i) the portion of Territory, as such Territory may be modified from time to
time during Associate's relationship with Representative; (ii) any state or any portion of any state
assigned to Associate by Representative for purposes of any sales or service activities or
responsibilities at any time during the twenty-four (24) months immediately preceding the
expiration or termination of Associate's relationship with Representative and (iii) any county of
any state or commonwealth assigned to Associate or in which Associate engaged in any sales or
service activities on behalf of Representative at any time during the twenty-four (24) months
immediately preceding the expiration or termination of Associate's relationship with
Representative. For purposes of this Agreement, the term "Competitive Business" means a
business that offers, provides or sells any Products similar to or competitive with, or that could
serve as a substitute for, any of the Products that are being offered or sold by Representative as
of the date Associate's relationship with Representative terminates.

**6. Reasonableness of Terms.**

Exhibit 3
Page 47 of 53

Associate acknowledges and agrees that the non-disclosure, non-solicitation and non-competition covenants contained in this Agreement are reasonably necessary to protect Representative's and Zimmer's legitimate business interests. Additionally, Associate acknowledges and agrees that the non-disclosure, non-solicitation and non-competition covenants are fair, reasonable, and appropriate in all respects, including, but not limited to, temporal duration, scope of prohibited activities and geographic area. Associate further acknowledges and agrees that the Restricted Customers do not, in the aggregate, constitute a significant percentage, as the case may be of the market for orthopaedic implants and devices. Associate further acknowledges and agrees that the non-disclosure, non-solicitation and non-competition covenants set forth in this Agreement will not pose any unreasonable hardship on Associate and that the terms of this Agreement will not prevent Associate from engaging in any trade on business including Associate's current occupation.

**7. At Will Relationship.**

Associate understands and acknowledges that nothing in this Agreement shall be understood, argued or interpreted to alter the at-will nature of the relationship between Associate and Representative, which may be terminated by Representative at any time for any lawful reason. Either Representative or Associate may terminate the relationship at any time, with or without cause.

**8. Compliance with Company Policies and Standards.**

Associate shall comply with all applicable rules and regulations of Representative and Zimmer, including, but not limited, to the policies and procedures of Zimmer, as are in effect from time to time. Associate shall comply with the AdvaMed Code of Ethics on Interactions with Health Care Professionals (as originally adopted on September 3, 2003, and including any subsequent amendments thereto) (the "Code"), any successor code, and any policies and procedures adopted by Representative or Zimmer in conjunction with or related to the Code (or the subject matter covered thereunder).

**9. Severability, Modification of Restrictions.**

Exhibit 3
Page 48 of 53

The covenants and restrictions in this Agreement are separate and divisible, and to the extent any clause, portion or section of this Agreement is determined to be unenforceable or invalid for any reason, Representative and Associate acknowledge and agree that such unenforceability or invalidity shall not affect the enforceability or validity of the remainder of the Agreement. If any particular covenant, provision or clause of this Agreement is determined to be unreasonable or unenforceable for any reason, including, without limitation, the temporal duration, scope of prohibited activity, and/or geographic area covered by any non-competition, non-solicitation or non-disclosure covenant, provision or clause, Representative and Associate acknowledge and agree that such covenant, provision or clause shall automatically be deemed reformed such that the contested covenant, provision or clause will have the closest effect permitted by applicable law to the original form and shall be given effect and enforced as so reformed to whatever extent would be reasonable and enforceable under applicable law. The parties agree that any court interpreting any non-competition, non-solicitation or non-disclosure provisions of this Agreement shall have the authority, if necessary, to reform any such provision to make it enforceable under applicable law.

### 10. Remedies.

Associate acknowledges that a breach or threatened breach by Associate of Sections 1, 2, 3, 4 or 5 of this Agreement will give rise to irreparable injury to Representative and Zimmer, and that money damages will not be adequate relief for such injury. Accordingly, Associate agrees that Representative and Zimmer shall be entitled to obtain injunctive relief, including, but not limited to, temporary restraining orders, preliminary injunctions and/or permanent injunctions, without having to post any bond or other security, to restrain or prohibit such breach or threatened breach, in addition to any other legal remedies which may be available. In addition to all other relief to which it shall be entitled, Representative and Zimmer shall be entitled to recover from Associate all litigation costs and attorneys' fees incurred by Representative or Zimmer in any action or proceeding relating to this Agreement in which Representative or Zimmer prevails in any respect, including, but not limited to, any action or proceeding in which Representative or Zimmer seeks enforcement of this Agreement or seeks relief from Associate's violation of this Agreement.

### 11. Survival of Obligations.

Exhibit 3
Page 49 of 53

Associate acknowledges and agrees that Associate's obligations under this Agreement, including, without limitation, Associate's non-disclosure, non-solicitation and non-competition obligations, shall survive the expiration or termination of Associate's relationship with Representative, whether or not such termination is with or without cause or whether or not it is voluntary or involuntary. Associate further acknowledges and agrees that Associate's non-disclosure, non-solicitation and non-competition covenants set forth in this Agreement shall be construed as independent covenants and that no breach of any contractual or legal duty by Representative or Zimmer shall be held sufficient to excuse or terminate Associate's obligations under this Agreement or to preclude Representative or Zimmer from obtaining injunctive relief or other remedies for Associate's violation or threatened violation of such covenants.

**12. Governing Law.**

This Agreement shall be construed and enforced in accordance with the laws of the State of Oklahoma, without application of any conflict of laws, rules or principles that would cause the application of the laws of any jurisdiction other than Oklahoma. The parties agree that any legal action relating to this Agreement shall be commenced and maintained exclusively before any appropriate state court located in Oklahoma County, Oklahoma, or the United States District Court for the District encompassing Oklahoma County, Oklahoma. The parties

Exhibit 3
Page 50 of 53

hereby submit to the jurisdiction and venue of such courts and waive any right to challenge or otherwise object to personal jurisdiction or venue (including an objection based on inconvenient forum grounds) in any action commenced or maintained in such courts.

**13. Successors and Assigns.**

This Agreement and the rights and obligations hereunder, are not assignable or otherwise transferable by Associate. Representative may assign this Agreement, and the rights and obligations of Representative hereunder, to Zimmer, or to any person, entity or business that succeeds Representative as Zimmer's sales representative in all or part of the Territory, or to any person, entity or other business or legal entity that acquires all or substantially all of the business or assets of Representative ("Acquirer") so long as the Acquirer continues to serve as Zimmer's representative in the Territory, or to Zimmer.

**14. Enforcement.**

Representative or Zimmer may enforce any provision of this Agreement regardless of whether Associate has any claim or cause of action against Representative based on this Agreement or otherwise. Associate hereby waives any breach of this Agreement by Representative as a defense to Representative's or Zimmer's enforcement of this Agreement. Associate's sole and exclusive remedy for any claim or cause of action against Representative based on this Agreement or otherwise shall be to assert a separate cause of action or claim against Representative for damages. The failure of Representative to enforce any provision of this Agreement against Associate (or any provision of a similar agreement against any other person) shall not be construed as a waiver of any such provision, nor prevent Representative from thereafter enforcing such provision or any other provision of this Agreement. The parties acknowledge and agree that Zimmer and its parents, affiliates, subsidiaries, successors and assigns are express third party beneficiaries of this Agreement with an independent right to enforce any of its provisions and that Zimmer or Representative may enforce this Agreement regardless of whether the relationship between Representative and Zimmer or Associate is expired or terminated for any reason.

Exhibit 3
Page 51 of 53

### 15. Entire Agreement.

This Agreement constitutes the complete understanding between the parties with respect to the subject matter thereof, and all prior representations or agreements relating thereto have been merged into this Agreement, excluding pre-existing non-competition and non-solicitation covenants between Associate and Representative. The terms of this Agreement shall control any conflicting provisions of any such prior covenants. No waiver, alteration or modification of any of the provisions of this Agreement shall be valid unless made in writing and signed by both parties.

### 16. Captions.

The captions appearing at the commencement of the sections hereof are descriptive only and for convenience of reference. Should there be any conflict between any such caption and the section at the head of which it appears, the provisions contained in such section will control and govern the construction of such section.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

RX MEDICAL, LLC

By: _____

Printed Name: Brandon Rouse

Title: President

ASSOCIATE

Name: _____

Exhibit 3
Page 52 of 53

EXHIBIT 1

Territory

Team OKC (including but not limited to Oklahoma County, Cleveland County)

Exhibit 3
Page 53 of 53