# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RX MEDICAL, LLC; ROK SALES, LLC; and ROK MEDICAL MANAGEMENT, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 22-cv-00731-PRW |
| ROBEN MELTON; JUSTIN POOS; BRADY CLINE; TODD PERRY; SHELBY BULLARD; GREG MASON; JOSHUA MCDONALD; KRISTY MOORE; DIGSS INVESTMENTS, LLC; STRYKER CORPORATION; SUMMIT SPINE SOLUTIONS, LLC; and RD MEDICAL, LLC, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER

## <u>TABLE OF CONTENTS</u>

PROCEDURAL HISTORY ................................................................................ 1

INTRODUCTION ........................................................................................... 2

ARGUMENT AND AUTHORITIES ............................................................... 8

  I.  THE TEMPORARY RESTRAINING ORDER ..................................... 8

  II.  PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION ........ 9

    A.  Plaintiffs are likely to succeed on the merits .................................... 11

      1.  Non-Solicitation by the Contract Employees .................................... 11

      2.  Use of Plaintiffs' Confidential Information and Trade Secrets by the Individual Defendants to Solicit Plaintiffs' Established Customers ......................................... 16

      3.  Use and Retention of Plaintiffs' Calendar Data that Was Deleted from Plaintiffs' Computer System without Authorization ................................................ 17

      4.  Use, Retention, and/or Abandonment of Plaintiffs' Supplies and Equipment .. 18

    B.  Plaintiffs would suffer irreparable harm if a temporary injunction is not granted ......................................................................................... 19

    C.  The harm to Plaintiffs outweighs any potential harm to Defendants ........... 21

    D.  The preliminary injunction is in the public interest ...................................... 22

    E.  A nominal bond would be sufficient to protect Defendants' interest ........... 22

CONCLUSION ............................................................................................. 23

## **TABLE OF AUTHORITIES**

**Cases**

*Autry v. Acosta, Inc.*,
    2018 OK CIV APP 8, 410 P.3d 1017 .......................................................... 15

*Bayly, Martin & Fay, Inc. v. Pickard*,
    1989 OK 122, 780 P.2d 1168 ............................................................... 13, 22

*Bd. of Regents of Univ. of Oklahoma v. Nat'l Collegiate Athletic Ass'n*,
    1977 OK 17, 561 P.2d 499 ...................................................................... 22

*City of Chanute v. Kansas Gas & Elec. Co.*,
    754 F.2d 310 (10th Cir. 1985) ................................................................ 10

*Coquina Oil Corp. v. Transwestern Pipeline Co.*,
    825 F.2d 1461 (10th Cir.1987) ............................................................... 22

*Crown Paint Co. v. Bankston*,
    1981 OK 104, 640 P.2d 948 .................................................................... 22

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
    269 F.3d 1149 (10th Cir. 2001) .......................................................... 10, 19

*Drummond Am. LLC v. Share Corp.*,
    CIV-08-1004-F, 2009 WL 2409190 (W.D. Okla. Aug. 3, 2009) ..................... 13, 14, 22

*Fahr v. State ex rel. Adams*,
    1951 OK 286, 237 P.2d 128 .................................................................... 21

*Garrison v. Baker Hughes Oilfield Operations, Inc.*,
    287 F.3d 955 (10th Cir. 2002) .................................................................. 9

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*,
    415 U.S. 423 (1974) ............................................................................... 2

*Inergy Propane, LLC v. Lundy*,
    2009 OK CIV APP 8, 219 P.3d 547 ........................................... 15, 16, 19, 22

*Iofina, Inc. v. Khalev*,
    CIV-14-1328-M, 2017 WL 663558 (W.D. Okla. Feb. 17, 2017) ....................... 22

*Kurtz v. Clark*,
  2012 OK CIV APP 103, 290 P.3d 779 ........................................................... 8

*MTG Guarnieri Mfg., Inc. v. Clouatre*,
  2010 OK CIV APP 71, 239 P.3d 202 ........................................................... 17

*Neil v. Pennsylvania Life Ins. Co.*,
  1970 OK 172, ¶ 16, 474 P.2d 961 ............................................................... 8

*Offutt v. Wagoner*,
  1911 OK 512, 120 P. 1018 ........................................................................... 9

*Pre-Paid Legal Servs., Inc. v. Smith*,
  CIV-11-333-FHS, 2011 WL 4862429 (E.D. Okla. Oct. 13, 2011) ................. 2

*Radiant Glob. Logistics, Inc. v. Furstenau*,
  368 F. Supp. 3d 1112 (E.D. Mich. 2019) .................................................... 17

*Sulphur Manor, Inc. v. Burwell*,
  CIV-15-250-RAW, 2015 WL 12564776 (E.D. Okla. July 8, 2015) ............. 22

*Sw. Stainless, LP v. Sappington*,
  582 F.3d 1176 (10th Cir. 2009) ................................................................. 20

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
  805 F.2d 351 (10th Cir. 1986) ............................................................... 9, 21

*Ziggy1 Corp. v. Lynch*,
  123 F. Supp. 3d 1310 (W.D. Okla. 2015) ................................................... 21

**Statutes**

12 Okla. Stat. § 1384.1(B) ............................................................................... 8

12 Okla. Stat. § 1384.1(D) ............................................................................... 8

12 Okla. Stat. § 1392 ...................................................................................... 8

15 Okla. Stat. § 217 ...................................................................................... 22

15 Okla. Stat. § 219A ............................................................................. 14, 16

15 Okla. Stat. § 219A. ................................................................................... 12

18 U.S.C. § 1030(g) ...................................................................................... 18

78 Okla. Stat. § 87(A) ................................................................................ 17

78 Okla. Stat. §§ 85-94 ............................................................................. 17

**Rules**

Fed. R. Civ. P. 65(a) .................................................................................. 1

Fed. R. Civ. P. 65(b)(2) ............................................................................. 9

Fed. R. Civ. P. 65(b)(3) ............................................................................. 1

Fed. R. Civ. P. 65(b)(4) ............................................................................. 2

Fed. R. Civ. P. 65(c) ................................................................................ 22

Plaintiffs, RX Medical, LLC ("RX Medical"), ROK Sales, LLC, and ROK Management, LLC ("Plaintiffs"), respectfully submit this Response to Defendants' Motion to Dissolve the Temporary Restraining Order ("TRO") issued by the District Court of Oklahoma County prior to removal (the "Motion") (Doc. No. 6). Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs request that the Court deny Defendants' Motion to dissolve the TRO, conduct an evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction on August 31, or extend the TRO until such time as a hearing can be scheduled, and enter a Preliminary Injunction against Defendants as more fully set forth herein.

## PROCEDURAL HISTORY

On August 19, 2022, Plaintiffs filed a Verified Petition in the District Court of Oklahoma County (Case No. CJ-2022-4032), along with an Emergency Motion for a Temporary Restraining Order and Temporary Injunction, asking the court to enter a TRO to protect the *status quo* for such period of time until the court could afford the parties a hearing on the issue of a temporary injunction. *See* Ex. 3 to Notice of Removal (Doc. No. 1-3). The Emergency Motion was granted, and the Court set a hearing on the temporary injunction for August 24, 2022, at 10 a.m. After service was obtained, Defendants' counsel informed Plaintiffs that Defendants wanted to strike the August 24 hearing. Defendants filed a Notice of Removal on August 24, 2022 (Doc. No. 1) and the instant Motion on August 25, 2022. Accordingly, Plaintiffs' Motion for Temporary Injunction was not decided prior to removal and is ripe for decision under Rule 65.[1] Pursuant to Rule 65(b)(3),

---

[1] Out of an abundance of caution, Plaintiffs are filing herewith a separate Motion for Preliminary Injunction.

the Court is directed to set the motion for hearing on the preliminary injunction "at the earliest possible time." Rule 65(b)(4) directs the Court to hear a motion to dissolve a TRO "as promptly as justice requires." The Court has scheduled a hearing for August 31, 2022, to decide whether the TRO should be dissolved. At that hearing, Plaintiffs understand that the Court will consider whether a preliminary injunction should issue and will be prepared to present evidence supporting its request. However, in the event that the Court is not prepared to hear evidence, it should properly extend the TRO pursuant to Rule 65(b)(2), preserving the *status quo* until such time as an evidentiary hearing on the preliminary injunction can be scheduled. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 441 (1974) (holding that when a party moves to dissolve a TRO issued by the state court prior to removal, the district court must *either* proceed with the hearing on a motion to dissolve as though it were the evidentiary hearing on the preliminary injunction *or* schedule the evidentiary hearing within the time frame established by Rule 65(b)); *Pre-Paid Legal Servs., Inc. v. Smith*, CIV-11-333-FHS, 2011 WL 4862429, at *4 (E.D. Okla. Oct. 13, 2011) (extending a TRO).

## **INTRODUCTION**[2]

Plaintiffs' business is the marketing, sale, and distribution of medical supplies. Plaintiffs have contractual agreements with medical product manufacturers to market, sell, and distribute the manufacturers' medical products to physicians, hospitals, and other

---

[2] Plaintiffs incorporate by reference herein the Statement of Facts in their Verified Petition (Exhibit 1 to Notice of Removal) (Doc. No. 1-1), but provide this general factual background to put their request for a preliminary injunction in context. Plaintiffs will be prepared to present additional testimony and evidence in support of the request at the hearing.

healthcare facilities to be used in the medical and surgical treatment of patients. For more than twenty (20) years, Plaintiffs have worked to establish, and have established, relationships with physicians, medical groups, hospitals, and other healthcare providers within Oklahoma who purchase and use their medical products.

A significant portion of Plaintiffs' business is the marketing, sale, and distribution of spine products, *i.e.*, products used in the treatment of patients undergoing spine surgery.[3] RX Medical employed a team of individuals to market, sell, distribute, and service its spine products ("Spine Team"), the core of which consisted of Roben Melton, Justin Poos, Brady Cline, Todd Perry, Shelby Bullard, Greg Mason, Joshua McDonald, and Kristy Moore (hereinafter collectively referred to as "Individual Defendants"). Defendant Poos managed Plaintiffs' Spine Team, which was comprised of two teams under him, one managed by Defendant Melton and the other by Defendant Cline.  Defendants Melton and Cline each managed the other six (6) sales representatives, including Defendants Perry, Bullard, Mason, and McDonald. Moore was the operations manager over revenue management and inventory management. Through years of employment with Plaintiffs, the Individual Defendants were provided with, and gained knowledge of, Plaintiffs' confidential and trade secret information, which includes, but is not limited to, strategic pricing information,

---

[3] RX Medical had a contractual agreement with ZimVie, Inc. ("ZimVie") to market, sell, and distribute its spine products to spine surgeons practicing in Oklahoma. The ZimVie contract was Plaintiffs' primary line of spine products. ZimVie, however, does not offer all products that Plaintiffs' spine surgeon and hospital customers may need in their spine surgeries.  To fill the gaps in the ZimVie product line, Plaintiffs contracted with other third-party medical device manufacturers, including, but not limited to, Centinel Spine, Spineology, and Zavation.  As a result, Plaintiffs have a complete and comprehensive line of spine products to offer to their customers – the physicians and hospitals that purchase Plaintiffs' products.

customer lists, customer preference data, customer usage data, and market data, and distributorship/agency agreements.

On Friday, August 12, 2022, each of the Individual Defendants resigned their employment with Plaintiffs, completely gutting Plaintiffs' Spine Team. But this story begins several years earlier. In 2019, Defendant Stryker Corporation ("Stryker")[4] and RX Medical entered into discussions about Stryker potentially acquiring Plaintiffs' spine business. As part of those discussions, Stryker – a competitor to RX Medical – obtained certain information about Plaintiffs' business and contracts, *specifically including the employment agreements of the four (4) Individual Defendants containing the non-solicitation provisions*. Although those discussions were not fruitful, it appears that Stryker found a way to "acquire" RX Medical's spine business without paying for it – by hiring away Plaintiffs' Spine Team (and ignoring their agreements with RX Medical, or perhaps indemnifying them against any violations of the same).

In fact, Plaintiffs have now learned that the Individual Defendants had been orchestrating this plan to leave the employment of Plaintiffs, join Stryker, and convert all of Plaintiffs' spine business to their competitor for at least **seven (7) months**. *See* Exhibit 1, Audio Recording of Telephone Conversation between Greg Oplotnik and Rob Melton on August 16, 2022, at 14:18-20. The Individual Defendants recognized that the departure

---

[4] Defendant Stryker is a competitor of Plaintiffs and ZimVie.  Stryker manufacturers similar spine products to those manufactured by ZimVie.  Stryker also has a sales force that markets, sells, and distributes its spine products to physicians and hospitals in the treatment of patients undergoing spine surgery, making them a direct competitor of Plaintiffs in the Oklahoma market. Stryker, DIGSS Investments, LLC ("DIGSS"), Summit Spine Solutions, LLC ("Summit Spine"), and RD Medical, LLC ("RD Medical") are collectively referred to as the "Corporate Defendants."

of Plaintiffs' Spine Team "was going to scorch the earth, and their departure was designed to "cripple" RX Medical. *See id*., at 9:24-10:3; 15:9-16, 23:3-6 (but Defendant Melton tells Oplotnik, "And now I'm trying to help you pick up the pieces"). But they did not care because Stryker "offered them the world." *See id*., at 9:24-10:3. And, ultimately, the lure of a financial windfall from Stryker was too much to ignore – so much so that the Individual Defendants began to siphon business from Plaintiffs **well before** the day they handed in their resignations. Indeed, during that seven-month period, the Individual Defendants and the Corporate Defendants worked in concert to develop and execute a scheme intended to overtake and destroy Plaintiffs' entire spine business. In fact, in his Declaration, Defendant Poos acknowledges that the jobs of the entire team that left Plaintiffs' employment for Stryker, *and their combined $2 million in annual salary*, are at risk if they are ***not*** allowed to take Plaintiffs' business – confirming that, as Plaintiffs suspected, the only reason Stryker hired them away was to "acquire" the business of Plaintiffs' established customers. *See* Ex. 1 to Motion, Decl. of Poos, ¶ 12.

Most notably, the Individual Defendants accessed and used Plaintiffs' pricing data to begin competing with Plaintiffs while still employed. Specifically, while still employed with Plaintiffs, Defendants surreptitiously submitted pricing bids to Plaintiffs' hospital customers on spine products that the Individual Defendants would be distributing ***after*** leaving their employment with Plaintiffs.  These are spine products that compete directly with those distributed by Plaintiffs. The Individual Defendants used Plaintiffs' pricing to match the pricing on the bids for the competing products.

Plaintiffs were completely blind-sided by the Individual Defendants' conduct, but since their departure, have learned that:

1.    The Individual Defendants shared pricing data, order history, and contract information for Plaintiffs' established customers with competitors while employed by Plaintiffs. Specifically, while still employed with Plaintiffs, Defendants surreptitiously submitted pricing bids to Plaintiffs' hospital customers on spine products that the Individual Defendants would be distributing after leaving their employment with Plaintiffs. *See* Exhibit 2, Melton Email. These are spine products that compete directly with those offered by Plaintiffs. The Individual Defendants used Plaintiffs' pricing to match the pricing on the bids for the competing products.

2.    Prior to their resignation, the Individual Defendants personally deleted at least twelve (12) calendar invites (and likely indirectly caused many more to be deleted) of upcoming spine procedures (*i.e.*, procedures after the effective date of the resignation) where Plaintiffs were providing supplies and services to their established customers – procedures where Stryker immediately stepped into the shoes of Plaintiffs and provided the supplies and services to Plaintiffs' established customers. *See* Exhibit 3, Declaration of Brett Mullins, ¶¶ 7-9 & Ex. 1 thereto. These calendars contained not only the times and dates of upcoming spine procedures, but also detailed information about the procedures and Plaintiffs' equipment and supplies needed for such procedures.   The Defendants' acts of removing these surgeries from Plaintiffs' calendars was intentional and put patients, physicians, hospitals, and the Plaintiffs at great risk.

3.    The Individual Defendants retained, abandoned, and/or discarded various supplies and equipment which they ordered for Plaintiffs, while employed by Plaintiffs, and failed to return them to Plaintiffs or otherwise account for them – *despite the fact that RX Medical retained the liability for the equipment and supplies.*

4.    The Individual Defendants began calling all of Plaintiffs' established customers to attempt to directly solicit them to become customers of Stryker before resigning their employment and directly contacted all, or significantly all, of Plaintiffs' established customers before, or on the day of, their resignation to directly solicit them to become customers of Stryker. *See* Ex. 1, Audio Recording, at 17:5-13.

5.    The Individual Defendants have continued to directly solicit Plaintiffs' established customers to become customers of Stryker. *See* Exhibit 4,

Declaration of Dr. Donald Horton, ¶¶ 3-5 (a 20-year customer of RX Medical was directly solicited by Defendant Cline on August 12, 2022).

Plaintiffs recognize that this is a highly-competitive business and success is driven in large part by personal relationships. And there is always the potential to lose a key employee to a competitor. But while the law generally favors professional mobility and the rights of employees to practice their profession in the interest of _fair_ competition, this highly orchestrated, seven-month attack on Plaintiffs' business, accomplished by Stryker with the help of Plaintiffs' own employees – funneling confidential information to a competitor while they were still employees – was far from ordinary fair competition. For example, it appears that at least one of the Individual Defendants (Melton) signed an employment agreement with Stryker on August 5, 2022, one week before his resignation, **wherein he agreed not to compete against Stryker**. *See* Exhibit 5, Melton-Stryker Employment Agreement.

Plaintiffs do not seek to prevent the Individual Defendants from competing against them. But they bargained for what this Court has previously described as a reasonable "hands-off policy" as to the solicitation of their established customers. And they reasonably expect the Defendants not to use or retain their confidential data and trade secret information and/or their physical equipment and supplies. Defendants' Motion to Dissolve the TRO should be denied and a preliminary injunction should issue to prevent that conduct to preserve the *status quo* and protect this Court's power to afford meaningful relief after a trial on the merits.

7

## ARGUMENT AND AUTHORITIES

I.    **THE TEMPORARY RESTRAINING ORDER.**

Under Oklahoma law, a temporary restraining order, or TRO, "may be granted without written or oral notice to the adverse party or the attorney for the adverse party … if … it clearly appears from specific facts shown by affidavit or by the verified petition that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or the attorney for the adverse party can be heard in opposition." 12 Okla. Stat. § 1384.1(B). The purpose of a TRO "is to restrain the defendant for what should be a very brief period, pending a hearing on the application for a temporary injunction, and it goes no further than to preserve the status quo until that determination, the status quo being the last actual, peaceable, noncontested status which preceded the pending controversy." *Kurtz v. Clark*, 2012 OK CIV APP 103, 290 P.3d 779, 786, citing *Neil v. Pennsylvania Life Ins. Co.*, 1970 OK 172, ¶ 16, 474 P.2d 961, 964–65.

Plaintiffs filed a verified Petition and an emergency motion for a TRO on Friday, August 19, 2022, requesting immediate relief to preserve the *status quo* and prevent (further) irreparable harm to Plaintiffs. The TRO was intended to be effective for only a short period of time until the Court could hold a hearing on Plaintiffs' request for a temporary injunction. The district court judge set the hearing "at the earliest possible time," the following Wednesday morning. *See* 12 Okla. Stat. § 1384.1(D). It was Defendants who asked that the hearing be stricken and postponed. Moreover, under Oklahoma law, there is no bond requirement associated with the issuance of a TRO (as compared to the requirement for a bond when a temporary injunction is issued). *See* 12 Okla. Stat. § 1392;

*Offutt v. Wagoner*, 1911 OK 512, 120 P. 1018, 1019 (holding that Oklahoma's statute does not require a bond for issuance of a TRO).

Given the severity and egregious nature of Defendants' conduct, the TRO was properly entered by the district court. However, a TRO is only intended to last for a short period of time, until the Court can hold a hearing on movant's request for a temporary/preliminary injunction. *See, e.g.*, Fed. R. Civ. P. 65(b)(2) (in federal court, a TRO expires after 14 days). Plaintiffs respectfully request that the Court hear the evidence and grant a preliminary injunction enjoining Defendants from their continued conduct.

## II.   PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION.

Because Defendants struck the state court hearing, Plaintiffs' motion for a temporary injunction, or a preliminary injunction under federal law, is still pending. "A federal court's equity jurisdiction affords it the power to enjoin otherwise lawful activity when necessary and appropriate in the public interest to correct or dissipate the evil effects of past unlawful conduct." *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 961 (10th Cir. 2002). The main purpose of a preliminary injunction is simply "to preserve the *status quo* pending the outcome of the case." *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986). The Court should issue a preliminary injunction where it is necessary to preserve its "power to render a meaningful decision on the merits." *See id.*

In order to obtain a preliminary injunction, a movant must establish "(1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the

party opposing the preliminary injunction; and (4) the injunction would not be adverse to the public interest." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp*., 269 F.3d 1149, 1154 (10th Cir. 2001). The Tenth Circuit has adopted a modified interpretation of the "likelihood of success" requirement where, if the other requirements for a preliminary injunction are satisfied, the movant can establish the "likelihood of success" requirement merely by showing "questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues fair ground for litigation and deserving of more deliberate investigation." *See City of Chanute v. Kansas Gas & Elec. Co.*, 754 F.2d 310 (10th Cir. 1985).

Plaintiffs' request for injunctive relief focuses on four main areas of improper conduct by Defendants:

1. The direct solicitation of Plaintiffs' established customers by Defendants Poos, Melton, Cline and Perry (hereinafter, the "Contract Employees").

2. The direct solicitation of Plaintiffs' established customers by Defendants Bullard, Mason, McDonald, and/or Moore (hereinafter the "Non-Contract Employees"), or any of the Corporate Defendants, through the use of confidential or trade secret information improperly acquired or obtained from Plaintiffs by the Contract Employees or any of the other Individual Defendants.

3. The use or retention of Plaintiffs' confidential calendar information, which was improperly acquired or obtained by Defendants, and deleted from Plaintiffs' computer system, for any purpose, including without limitation competing against Plaintiffs to solicit business from, or provide equipment or services to, Plaintiffs' established customers.

4. The use or retention of Plaintiffs' medical equipment and supplies, which Defendants failed to return or otherwise account for.

A preliminary injunction should issue to prevent this continued conduct to protect the *status quo* and preserve the Court's power to render a meaningful decision on the merits here.

**A.    Plaintiffs are likely to succeed on the merits.**

Plaintiffs are likely to succeed on the merits on each of their claims aimed at the four primary forms of unlawful conduct carried out by Defendants.

1.    <u>Non-Solicitation by the Contract Employees</u>.

The Individual Defendants have been and continue to actively and directly solicit Plaintiffs' established customers. *See, e.g.*, Ex. 1, Audio Recording, at 19:19-20:10; Ex. 5, Decl. Horton, ¶ 5. Plaintiffs are likely to succeed under the non-solicitation agreements between RX Medical and certain of the Individual Defendants (*i.e.*, the Contract Employees). The Employee Non-Compete Agreements entered between RX Medical and Individual Defendants Melton, Poos, and Cline, and the Confidentiality and Non-Competition Agreement entered between RX Medical and Individual Defendant Perry, each contain valid and enforceable restrictions against the solicitation of Plaintiffs' established customers. Oklahoma law specifically permits employers to enter agreements with employees that prevent them from directly soliciting the sale of goods and/or services from the employer's established customers upon termination of the employment relationship.

> A person who makes an agreement with an employer, whether in writing or verbally, not to compete with the employer after the employment relationship has been terminated, shall be permitted to engage in the same business as that conducted by the former employer or in a similar business as that conducted by the former employer as long as the former employee does not directly

> solicit the sale of goods, services or a combination of goods and services
> from the established customers of the former employer.

15 Okla. Stat. § 219A.

In consideration of and as a condition of RX Medical's employment of Defendants

Melton, Poos, and Cline, each individually entered an Employee Non-Compete Agreement

with RX Medical that stated:

> For Good consideration, and in consideration of my being employed,
> whether on a sub contract basis or as a full time employee, in whole or in part
> by RxMedical, I the undersigned agree that upon my termination of
> employment and notwithstanding the cause of termination, I shall not
> compete with the business of the Firm or its successors or assigns.
>
> The term "not compete" as used in this agreement shall mean that I shall not
> directly or indirectly, or in any capacity, on my own behalf or on behalf of
> any other firm undertake or assist in the solicitation of any client or account
> of the Firm existing during the course of my employment with Rx Medical.
>
> This non-compete agreement shall remain in full force and in effect for one
> year commencing with the date of employment termination.

*See* Exhibit 1 to Verified Petition (Doc. 1-1), the Employee Non-Compete Agreements for

Defendants Melton, Poos, and Cline (emphasis added).

In consideration and as a condition of Defendant Perry's employment with RX

Medical, Defendant Perry entered into a Confidentiality and Non-Competition Agreement

with RX Medical that stated:

> In consideration of the Representative providing the Training to Associate,
> for a period of twelve (12) months beginning on the later of (a) termination
> or expiration of Associate's or Zimmer's relationship with Representative for
> any reason, or (b) the date on which Associate begins to comply with this
> Section 3, Associate shall not (except with the prior written consent of
> Representative or Zimmer), directly or indirectly, on Associate's own behalf,
> or on behalf of any person, firm, corporation or other business or legal entity,
> solicit, attempt to solicit or engage in discussions or other communications

> <u>with (regardless of who initiates such discussions or communications), any
> Restricted Customer (defined below) with the purpose or intent of promoting,
> selling, or obtaining orders for any orthopaedic implants or devices or related
> medical products, services, instruments or supplies.</u>

*See* Exhibit 2 to Verified Petition (Doc. 1-1), Confidentiality and Non-Competition

Agreement between RX Medical and Defendant Perry (emphasis added).

The Employee Non-Compete Agreements between RX Medical and Individual

Defendants Melton, Poos, and Cline prohibit them from directly or indirectly soliciting

Plaintiffs' established customers. Oklahoma law prohibits only *unreasonable* restraints on

the exercise of a lawful profession, trade, or business. *See Bayly, Martin & Fay, Inc. v.*

*Pickard*, 1989 OK 122, 780 P.2d 1168, 1172. This District Court (Judge Friot) has

described the distinction between a restraint that is "reasonable" and one that is

"unreasonable" as follows:

> A covenant not to compete is unreasonable and does not protect a legitimate
> interest of an employer if its object is revealed to prevent ordinary
> competition. An employer may only contractually protect itself from unfair
> competition and not from the ordinary fair competition. **Thus, contractual
> provisions which require a former employee to "maintain a 'hands-off'
> policy" as to the employer's customers have been upheld**. However,
> contractual provisions which impose more than a "hands-off policy" as to the
> employer's customers and thus prevent fair competition have been declared
> void.

*Drummond Am. LLC v. Share Corp.*, CIV-08-1004-F, 2009 WL 2409190, at *2 (W.D.

Okla. Aug. 3, 2009) (emphasis added). Judge Friot enforced a very similar non-solicitation

provision, which stated:

> During the term of [her] independent sales agency hereunder and for a period
> of two (2) years following termination thereof, whether by [herself] or by
> COMPANY, for whatever reason and whether for cause or without cause,
> AGENT shall not, directly or indirectly, for or on behalf of [herself] or any

person, firm or entity solicit orders from or sell to any customer whom or which [she] solicited or sold on behalf of COMPANY during the last twelve (12) months of [her] relationship with COMPANY, any products competitive to those distributed by COMPANY. Products competitive to those distributed by COMPANY are those which are substantially similar to or serve substantially similar functions as those products listed in COMPANY's Sales Kit, Catalogs and Manuals furnished to AGENT from time to time.

*Id.*, at *3. The Court found that: (1) the restriction was properly applied only to plaintiff's "existing or established" customers, based upon plaintiff's representations in its filings that it interpreted the provision that way; (2) the non-solicitation provision did not restrict defendant "from exercising her lawful profession" and only required a "hands-off" policy as to plaintiff's existing or established customers; (3) the two-year time restriction period was reasonable; and (4) the non-solicitation provision was consistent with 15 Okla. Stat. § 219A (which was enacted in 2001). *See id*. The non-solicitation provisions in the Contract Employees' agreements are largely consistent with this provision and enforceable under Oklahoma law. Plaintiffs do not attempt to restrict the Contract Employees from lawfully exercising their profession, but only ask the Court to enforce a "hands-off" policy as to Plaintiffs' existing or established customers.

As Judge Friot recognized, judicial modification of a non-solicitation clause is appropriate, so long as the Court is not required to supply essential terms, but found that no modification was necessary as to the provision at issue. *See id*. This includes the term "indirectly." Oklahoma courts have generally held that a non-solicitation provision cannot prevent an employee from accepting unsolicited business from an otherwise prohibited customer. To the extent that is what courts view as "indirect" solicitation, it would perhaps be improper. But here, Plaintiffs only seek to restrict "active" solicitation. The "indirect"

solicitation Plaintiffs view as inappropriate here would be for Defendant Poos, for example, to "indirectly" solicit business by actively approaching a doctor who is one of Plaintiffs' established customers, or actively attending a surgical procedure involving the same, together with one of the Non-Contract Employees, or another Stryker employee, to accomplish indirectly that which the agreement prevents him from accomplishing directly. For example, Plaintiffs have evidence including a photograph of equipment and supplies for a spine procedure for one of Plaintiffs' established customer where the name and phone number of Defendant Poos is stricken through and the name of a different Stryker representative is added. *See* Exhibit 6, Photograph of Supplies.

If this is a concern for the Court, the Court may reform and enforce this agreement simply by deleting the word "indirectly." A case somewhat on point is *Autry v. Acosta, Inc.*, 2018 OK CIV APP 8, ¶ 31, 410 P.3d 1017, 1024, although it is not binding on this Court and, in Plaintiffs' view, is wrongly decided. There, the trial court issued an injunction, but recognized that the non-solicitation agreement needed to be reformed and could "be easily corrected" to comply with Section 219A by deleting the word "indirectly." The Court of Appeals found it was "not quite that simple" because the provision had other issues, in that it was not limited to established customers and was broader than "solicitation," covering also "promoting." To the contrary, and more similar to the facts here, in *Inergy Propane, LLC v. Lundy*, 2009 OK CIV APP 8, ¶ 37, 219 P.3d 547, 560, the Court of Appeals affirmed the grant of a preliminary injunction where the trial court properly found that a non-solicitation provision was enforceable as to "active solicitation," but could not be relied upon to prevent "accepting unsolicited business." Because the

provision here otherwise complies with Section 219A, and Plaintiffs are only seeking to enjoin the Contract Employees from actively soliciting established customers, the Court can enforce it and reform it by deleting the word "indirectly," if it views such modification as necessary.

The Confidentiality and Non-Competition Agreement entered between RX Medical and Defendant Perry is slightly broader than the other agreements. In addition to containing the word "indirectly," it also purports to prevent more than active solicitation. However, the Court could properly reform the agreement by deleting the phrase "engage in discussions or other communications with (regardless of who initiates such discussions or communications)" without supplying material terms.  In doing so, the Court would provide the injunctive relief Plaintiffs are seeking under *Inergy Propane* – an injunction preventing the Individual Defendants from actively soliciting their established customers.

   2. <u>Use of Plaintiffs' Confidential Information and Trade Secrets by the Individual Defendants to Solicit Plaintiffs' Established Customers.</u>

The Individual Defendants shared pricing data, order history, and contract information for Plaintiffs' established customers with competitors while employed by Plaintiffs. They also had access to other confidential business information including, but not limited to, pricing data and detailed customer statistics reports, such as territory reports and alignment reports, sales overviews, and medical supply overviews. None of the Individual Defendants – whether they were under contract or not – should be permitted to use Plaintiffs' confidential information and trade secrets to solicit Plaintiffs' established customers. *See, e.g.*, Exhibit 7, Code of Business Conduct and Professional Ethics, at 7.

Given these facts, Plaintiffs are also likely to prevail on their claims of misappropriate of trade secrets under Oklahoma's Uniform Trade Secrets Act, 78 Okla. Stat. §§ 85-94 (the "OUTSA"). To prove misappropriation of a trade secret, plaintiff must show "(i) the existence of a trade secret, (ii) misappropriation of the secret by defendants, and (iii) use of the secret to [plaintiff's] detriment." *MTG Guarnieri Mfg., Inc. v. Clouatre*, 2010 OK CIV APP 71, ¶ 12, 239 P.3d 202, 209. The Court may issue an injunction to prevent an actual or threatened misappropriation. 78 Okla. Stat. § 87(A). The confidential information used by Defendants here fits the definitions of "trade secrets" under the OUTSA. For example, information comprised of financial statistics of a plaintiffs' top accounts available to a former employee for several quarters prior to his resignation is "uniquely useful to competition" with the former employer and considered "trade secrets." *See Radiant Glob. Logistics, Inc. v. Furstenau*, 368 F. Supp. 3d 1112, 1127 (E.D. Mich. 2019) (granting preliminary injunction).

        3.     <u>Use and Retention of Plaintiffs' Calendar Data that Was Deleted from Plaintiffs' Computer System without Authorization</u>.

The Individual Defendants, either personally or by others at their direction, caused numerous surgical procedures scheduled after the date of their resignation to be deleted from Plaintiffs' computer systems. *See* Ex. 3, Decl. Mullins, ¶ 8. These calendars contained not only the times and dates of upcoming spine procedures, but also detailed information about the procedures and Plaintiffs' equipment and supplies needed for such procedures. The Defendants' acts of removing these surgeries from Plaintiffs' calendars was intentional and put patients, physicians, hospitals, and/or the Plaintiffs at great risk. Thus, Plaintiffs

are also likely to prevail on their claim(s) of computer fraud and abuse under the Computer Fraud and Abuse Act, which prohibited Defendants' unauthorized access of Plaintiffs' computer systems/servers and resulted in damages and/or losses of "at least $5,000 in value" and the "potential modification or impairment of the medical…treatment or care of 1 or more individuals."   Indeed, among the actions described in Plaintiffs' Petition, Defendants deleted information from Plaintiffs' computer system/servers regarding scheduled surgical procedures for patients in need of spine surgeries, including data related to the types of procedures being performed and the equipment and supplies needed.  The Computer Fraud and Abuse Act provides that "any person who suffers damage or loss" as described by the act may maintain injunctive relief or other equitable relief from the Court. *See* 18 U.S.C. § 1030(g).  Plaintiffs are entitled to injunctive relief and/or equitable relief.

4.     <u>Failure to Return Plaintiffs' Supplies and Equipment</u>.

The Individual Defendants failed to return various supplies and equipment which they ordered for Plaintiffs, while employed by Plaintiffs. Plaintiffs remain responsible, financially and otherwise, for these equipment and supplies. There is simply no legal basis for any of the Defendants to use or retain these equipment and supplies and they should immediately be accounted for and returned to Plaintiffs.

While Plaintiffs are continuing to collect and review data regarding the Individual Defendants' acts both during and after their employment with Plaintiffs ended, it is clear that the Individual Defendants coordinated this effort for approximately seven months with Stryker and the other Defendants, disclosed confidential client data of Plaintiffs (most notably competitive pricing data) – even while still employed by Plaintiffs – and

18

orchestrated a complete coup to solicit Plaintiffs' established customers to do business with Stryker and the other Defendants immediately, including by deleting calendar entries regarding scheduled surgical procedures in Plaintiffs' system for the week following their resignation on Friday and being fully prepared to provide the equipment and services for such procedures on Monday.

**B.      Plaintiffs would suffer irreparable harm if a preliminary injunction is not granted.**

The Oklahoma courts have recognized that damages associated with violation of non-solicitation provisions are difficult to calculate and, therefore, "injunctive relief has traditionally been granted in this context." *Inergy Propane*, 2009 OK CIV APP 8, ¶ 44, 219 P.3d at 561. Moreover, the Tenth Circuit has identified certain factors that support irreparable harm determinations in the context of non-solicitation, including "inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products." *Dominion Video Satellite,* 356 F.3d at 1263. As the Tenth Circuit has held, issues involving unfair competition and use of confidential information and trade secrets necessarily impact customer goodwill and are difficult to calculate or compensate with money damages.

> A district court may find irreparable harm "based upon evidence suggesting that it is impossible to precisely calculate the amount of damage plaintiff will suffer."  Oklahoma describes an injury as "irreparable when it is incapable of being fully compensated for in damages or where the measure of damages is so speculative that it would be difficult if not impossible to correctly arrive at the amount of the damages." **One such situation in which damages may not fully compensate a plaintiff is when the business at issue "is based on personal contacts and a knowledge of the special needs and**

19

**requirements of customers, a fact which complicates any damage estimate.”**

*Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191–92 (10th Cir. 2009) (emphasis added) (citations omitted).

The industry in which Plaintiffs compete absolutely fits the description the Tenth Circuit provided in *Sw. Stainless*. This business is highly driven by personal contacts and relationships, and in particular, specific knowledge of customer needs and other confidential information. Indeed, Stryker and Defendant Melton, for example, both acknowledged in their employment agreement that “Confidential Information is of great value” and the unauthorized disclosure of confidential information “will cause immediate irreparable injury.” *See* Ex. 5, Melton-Stryker Agreement, § 5.1. Here, Plaintiffs spent more than twenty (20) years cultivating the relationship with spine physicians in the Oklahoma City area and building a robust client base, focused on trust and goodwill. This goodwill has already been serious eroded, as Plaintiffs’ equipment and supplies have been abandoned and hospitals have asked them to come clean up their stuff, they have lost critical contracts with doctors and medical product suppliers, and a substantial portion of their spine products business has been assumed by Stryker. Plaintiffs have suffered and continue to suffer irreparable harm to their goodwill and their customer relationships, which cannot be fully compensated with money damages.

Plaintiffs have also suffered, and will continue to suffer, irreparable harm as a result of Defendants’ violations of the OUTSA and the Computer Fraud and Abuse Act. Stryker and the Individual Defendants have colluded to use Plaintiffs’ confidential and trade secret

data and other information improperly obtained from Plaintiffs' computer system to compete with, and provide spine equipment and services to, Plaintiffs' established customers. Defendants' continued use of Plaintiffs' data, and unfair competition, threatens the viability of Plaintiffs' business, a fact which alone has been found to meet the showing of irreparable injury. *See Ziggy1 Corp. v. Lynch*, 123 F. Supp. 3d 1310, 1320 (W.D. Okla. 2015), citing *Tri–State Generation & Transmission*, 805 F.2d at 356. An injunction is necessary to prevent further harm here.

### C.   The harm to Plaintiffs outweighs any potential harm to Defendants.

Conversely, while Plaintiffs will suffer irreparable harm the longer the Defendants are permitted to unfairly compete and use their confidential data and trade secrets against them, there is no harm to Defendants. Plaintiffs are not seeking to prevent Defendants from engaging in competition. However, without immediate injunctive relief, Defendants will continue to benefit from their misappropriation of trade secrets and other confidential data, computer fraud and abuse.  Requiring the Individual Defendants to comply with their legal obligations and preventing Stryker and the other Defendants from unfairly profiting from the Individual Defendants' violations of their legal obligations, contractual obligations and misappropriate Plaintiffs' trade secrets causes them no legally cognizable harm. *See Fahr v. State ex rel. Adams*, 1951 OK 286, ¶12, 237 P.2d 128, 130 ("It is difficult to see how [defendants] are hurt by this injunction, as all it does is order them to obey the law."). It is telling that Defendant Poos claims the Individual Defendants will be harmed if they are not allowed to directly compete and solicit and obtain business from Plaintiffs' established customers *because their continued employment with Stryker depends on it*.

**D.     The preliminary injunction is in the public interest.**

Oklahoma law has made clear that reasonable restrictions on the exercise of trade are in the public interest and will be enforced. *Bayly, Martin & Fay, Inc.*, 780 P.2d at 1170–72; *see also Inergy Propane*, 2009 OK CIV APP 8, ¶¶ 44-45, 219 P.3d at 562; *Drummond Am. LLC*, 2009 WL 2409190, at *2-3. Only unreasonable restraints on trade are invalidated pursuant to 15 Okla. Stat. § 217. *See id.*; *see also Crown Paint Co. v. Bankston,* 1981 OK 104, 640 P.2d 948, 952; *Bd. of Regents of Univ. of Oklahoma v. Nat'l Collegiate Athletic Ass'n*, 1977 OK 17, 561 P.2d 499, 508. Accordingly, because the non-solicitation provisions found in the employment contracts of the Contract Employees comply with Sections 217-219, they are reasonable. Further, "the public never benefits from trade secret misappropriation." *See Iofina, Inc. v. Khalev*, CIV-14-1328-M, 2017 WL 663558, at *3 (W.D. Okla. Feb. 17, 2017). Accordingly, the public interest would be served by the issuance of a preliminary injunction here.

**E.     A nominal bond would be sufficient to protect Defendants' interest.**

Rule 65(c) requires the movant to post a bond to secure issuance of a preliminary injunction. However, as the Tenth Circuit has recognized, the trial court has the discretion to set the amount of the bond, even at a nominal amount, or to determine that no bond is necessary. *See Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir.1987); *Sulphur Manor, Inc. v. Burwell*, CIV-15-250-RAW, 2015 WL 12564776, at *2 (E.D. Okla. July 8, 2015) (finding no bond was necessary). Under the current circumstances, Plaintiffs believe a bond of $3 million is entirely unreasonable. The Individual Defendants state that their combined annual salary is $2 million, and then

request as a bond 1½ times that amount (despite only having a 1-year non-solicitation clause), basically suggesting that their employment with Stryker would be jeopardized if they are not permitted to unfairly compete with Plaintiffs and solicit their established customers.   A nominal amount would be sufficient to protect Defendants' interests, particularly where, as here, the only risk is to the Contract Employees (or other Individual Defendants using Plaintiffs' confidential information) – and it was a risk Stryker knew about (because they had access to the employment agreements) and the former employees voluntarily accepted when Stryker "offered them the world" to shift their allegiance and compete against Plaintiffs.

## **CONCLUSION**

For the reasons set forth herein, pursuant to Rule 65, Plaintiffs respectfully request that the Court deny Defendants' Motion to dissolve the TRO, conduct an evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction on August 31, or extend the TRO until such time as a hearing can be scheduled, and enter a Preliminary Injunction against Defendants ordering:

1.     The Contract Employees (Defendants Poos, Melton, Kline and Perry) to immediately cease and desist from directly soliciting any person or company who was an established customer of Plaintiffs.

2.     The Individual Defendants to immediately cease and desist from assisting the Corporate Defendants, or any of their respective employees or agents, in directly soliciting any person or company who was an established customer of Plaintiffs through the use of confidential data or trade secrets learned by the Individual Defendants during

the course of the Individual Defendants' employment with Plaintiffs, or secured by Defendants through their collective unauthorized access to Plaintiffs' computer systems and/or servers.

3.     The Corporate Defendants to immediately cease and desist from assisting with, or participating in, the Contract Employees' direct solicitation of any person or company who was an established customer of Plaintiffs through the use of confidential data or trade secrets learned by the Individual Defendants during the course of the Individual Defendants' employment with Plaintiffs, or secured by Defendants through their collective unauthorized access to Plaintiffs' computer systems and/or servers.

4.     The Individual Defendants and the Corporate Defendants to immediately cease and desist from using, and to return to Plaintiffs, any and all confidential materials, and other such material as may be considered by Plaintiffs to be trade secrets, which were generated by or for Plaintiffs, and/or which were learned or obtained by the Individual Defendants, during the course of the Individual Defendants' employment with Plaintiffs, or secured by Defendants through their collective unauthorized access to Plaintiffs' computer systems and/or servers, including without limitation any strategic pricing information, customer lists, customer preference data, customer usage data, and market data.

5.     The Defendants to immediately return to Plaintiffs all of Plaintiffs' medical equipment, instruments, and supplies which were taken by the Defendants, and/or not returned to Plaintiffs, upon the resignation of the Individual Defendants.

6.     The Defendants to immediately identify and provide to Plaintiffs all calendar and scheduling information regarding upcoming procedures and/or orders, which the Individual Defendants improperly deleted and/or destroyed upon their resignation, and all information copied, shared and/or disclosed by the Individual Defendants to Stryker or the other Corporate Defendants, including through their unauthorized access to Plaintiffs' computer systems/servers.

*s/Jason A. Ryan*
PATRICK R. PEARCE, JR., OBA #18802
JASON A. RYAN, OBA #18824
COREY A. NELLER, OBA #19534
**RYAN WHALEY**
400 North Walnut Avenue
Oklahoma City, Oklahoma 73104
(405) 239-6040
(405) 239-6766 FAX
rpearce@ryanwhaley.com
jryan@ryanwhaley.com
cneller@ryanwhaley.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 29, 2022, I electronically transmitted the attached document to the Clerk of Court using the Electronic Filing System for filing.  Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the ECF System.

*s/Jason A. Ryan*
Jason A. Ryan
